**Bruce BORAAS et al., Plaintiffs-Appellants,**

v.

**The VILLAGE OF BELLE TERRE, an incorporated municipality, et al., Defendants-Appellees.**

No. 372, Docket 72-2040.

United States Court of Appeals, Second Circuit.

Argued Oct. 19, 1972.

Decided Feb. 27, 1973.

Rehearing En Banc

Denied March 16, 1973.

Opinion Dissenting From Denial of Rehearing En Banc April 5, 1973.

Lawrence G. Sager, New York City (Arthur N. Eisenberg, Bruce J. Ennis, New York Civil Liberties Union, New York City, of counsel), for plaintiffs-appellants.

Bernard E. Gegan, Port Washington, N. Y. (James J. von Oiste, Village Atty., Port Jefferson, N. Y., of counsel), for defendants-appellees.

Before MANSFIELD, OAKES and TIMBERS, Circuit Judges.

MANSFIELD, Circuit Judge:

At issue upon this appeal is the constitutionality of a zoning ordinance of the incorporated Village of Belle Terre, New York, which prohibits groups of more than two (2) unrelated persons, as distinguished from traditional families consisting of any number of persons related by blood, adoption, or marriage, from occupying a residence in an area zoned for "one-family" occupancy. We hold that since the discriminatory classification is unsupported by any rational basis consistent with permissible zoning law objectives, it transgresses the Equal Protection Clause. The district court's decision denying preliminary injunctive relief against enforcement of the ordinance is reversed.

Plaintiffs Edwin and Judith Dickman, owners of a house in Belle Terre, a suburban municipality with approximately 700 residents occupying some 220 homes in Suffolk County, New York, have rented their six-bedroom, single-family residence for occupancy to plaintiffs Bruce Boraas, Anne Parish and Michael Truman, all students at the State University of New York at Stony Brook, located seven or eight miles away, and to three other students attending the same university who are not parties to the instant action. The premises were originally leased on or about December 31, 1971, by plaintiff Truman as lessee for a term ending May 31, 1973, at a month-

ly rental of $500. Plaintiff Boraas later became a co-signer of the lease on the same terms.

None of the six student occupants is related. Each occupies one of the six bedrooms and pays a portion of the rent. The six are organized and function as a single housekeeping unit insofar as they use the common cooking facility, dine together and share housekeeping, "yard" chores, and a "house" checking account from which disbursements for necessary household expenses are made. It is conceded that all of the occupants have behaved in a responsible manner, and no immoral conduct on their part is suggested. Four of them are pursuing graduate studies in sociology at Stony Brook.

Plaintiffs assert that before leasing the Belle Terre residence from the Dickmans they looked extensively for alternatives to traditional dormitory living, which admittedly are available. Conventional apartment rentals, when available, however, were found to be beyond their means, and a cooperative housing arrangement was considered by them to be pleasant, convenient, promotive of scholarly exchange, and within their pocketbooks.

The Village of Belle Terre, which consists of approximately 220 homes, is zoned exclusively for residence in one-family dwellings.[1] A "family" is defined as:

"One or more persons related by blood, adoption or marriage, living and cooking together as a single housekeeping unit . . . a number of persons but not exceeding two (2) living and cooking together as a

single housekeeping unit though not related by blood, adoption, or marriage shall be deemed to constitute a family." The Building Zone Ordinance of the Village of Belle Terre, Art. I, § D–1.35a (June 8, 1970).

To enforce the zoning code the ordinance further provides:

"Each violation of this ordinance shall constitute disorderly conduct. . . . [Persons] shall be liable for and pay a penalty not exceeding One Hundred Dollars ($100.00) or by imprisonment for a period not exceeding 60 days or by both such fine and imprisonment. A separate and distinct offense shall be deemed committed on each day during or on which a violation occurs or continues." Building Zone Ordinance of the Village of Belle Terre, Art. VIII, Part 4, § M–1.4a(2) (Oct. 17, 1971).

On June 8, 1972, Boraas and Truman were denied residents' beach passes because the ordinance allegedly considered them "illegal residents."[2] On July 19, 1972, the Dickmans, the owners-lessors, were served with a summons returnable before the Village Justice on July 28, 1972. However, because the Village Code required a 48-hour notice of violation, which had not been complied with, the summons was withdrawn. On July 31, 1972, the Dickmans were served with the required "Order to Remedy Violations" which notified plaintiffs that failure to remedy the condition might subject them to liability commencing on August 3, 1972.

On August 2, 1972, plaintiffs commenced an action in the district court under the federal Civil Rights Act of 1871, 42 U.S.C. § 1983, against appellees,

---

1. A one-family dwelling is defined as:
 "A detached house consisting of or intended to be occupied as a residence by one family only, as family is hereafter defined. In no case shall a lodging house, boarding house, fraternity house, sorority house or multiple dwelling be classified or construed as a one family dwelling." Building Zone Ordinance of the Village of Belle Terre, Art. I, § D–1.34a (1971).

2. Plaintiffs assert that this was the explanation given by one of the individual defendants, Francis R. Stolz, a Trustee of the Village. Other named defendants are James Philbin, Mayor of the Village, Robert Doerr, Deputy Mayor and Trustee, Vincent Bove, Trustee, and Vincent Karwowski, Trustee.

who are the Mayor and Trustees of Belle Terre, seeking preliminary and permanent injunctive relief against enforcement of the ordinance and a declaratory judgment invalidating as unconstitutional the prohibition against residential occupancy by more than two persons "not related by blood, adoption, or marriage." [3] Jurisdiction was grounded on 28 U.S.C. §§ 1331(a), 1343, and 2201. Pending a hearing on the constitutional issues, Judge Dooling issued a temporary restraining order.

Following a hearing on plaintiffs' motion for a preliminary injunction, Judge Dooling on September 20 issued a 40-page decision and order denying the motion for a preliminary injunction and upholding the validity of the ordinance. A temporary restraining order was continued for five days to enable plaintiffs to seek a stay pending appeal, which was granted by this Court on September 27, and thereafter extended to the date of our decision and mandate.

In his carefully considered opinion Judge Dooling decided that he was not precluded from reaching the merits by Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), its brethren, or by the anti-injunction statute, 28 U. S.C. § 2283 (1965), and that abstention was not appropriate for the reason that the New York decisional law clearly indicated that the zoning ordinance would be deemed an exercise of power granted by New York's enabling legislation, N.Y. Village Law §§ 175, 177. See, e. g., City of Schenectady v. Alumni Association of Union Chapter, 5 A.D.2d 14, 168 N.Y.S. 2d 754 (3d Dept. 1957). Recognizing that plaintiffs had the "unquestionable right to live together in student groupings," free from unwarranted public intrusions, just as traditional families had the right to live in areas restricted to

one-family dwellings, he summarized the issue before the court as follows:

"The question ultimately posed is whether it is lawful to have a one-family dwelling zone district which excludes equally small household groups who impose no greater burdens of use on the land, the building or the surrounding than a blood-and-marriage family group on the simple and bare ground that such student groups are not families made up of husband, wife and children." (A. 73a).

Judge Dooling concluded that the exclusionary classification could not be upheld on traditional grounds supporting zoning regulations as a valid exercise of state police power, see Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926), because it did not promote "such familiar zoning objectives as safety, adequate light and air, preservation of the land from overintensive use, avoiding crowding of the population, reduction of traffic congestion and facilitation of adequate transportation, water, sewerage, school, park and other public services." (A. 77a). However, he decided that the ordinance represented a lawful exercise of a "legally protectable affirmative interest" in the family made up of married parents and children, i. e., the traditional "marriage-and-blood-related" families of the type presently occupying Belle Terre. Holding that the interest of such traditional families in maintaining uses of the same character in the community is a "proper zoning consideration," he described "[s]uch zoning [as] simply another of countless statutes of bounty and protection with which the states, and all of them, and the Federal government alike aggressively surround the traditional family of parents and their children, reaching from family court laws, through laws of inheritance to tax laws." (A. 77a).

3. Specifically, the complaint alleged that the ordinance denied the plaintiffs' equal protection of the law, violated their right of association as secured by the First and Fourteenth Amendments, intruded on their constitutionally protected right of privacy, and contravened their right to travel. On appeal, the primary reliance has been on the equal protection claim at least insofar as the ordinance allegedly impinged unequally on the other specified constitutional rights.

In reaching its decision the district court gave weight to the smallness of the Belle Terre community, the absence of similar restrictive or exclusionary classifications in some nearby communities, and the existence of dormitory facilities at Stony Brook itself. Appellants here seek reversal on the ground that the Belle Terre zoning ordinance impinges upon their constitutional rights of privacy and association.

*Procedural Questions*

■ Although we are faced at the outset with a number of procedural questions, we agree with the district court that none of them precludes consideration of the merits. Since the Belle Terre ordinance was not of state-wide applicability, the statutory requirement for consideration by a three-judge court, 28 U.S.C. § 2281, has no application.

"The court has consistently construed the section [2281] as authorizing a three-judge court not merely because a state statute is involved but only when a *state statute of general and statewide application* is sought to be enjoined." Moody v. Flowers, 387 U.S. 97, 101, 87 S.Ct. 1544, 1548, 18 L.Ed.2d 643 (1967); see Ex parte Collins, 277 U.S. 565, 48 S.Ct. 585, 72 L. Ed. 990 (1928). (Emphasis supplied.)

■ We further conclude that Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and its brethren,[4] which held that in the absence of extraordinary circumstances threatening irreparable injury federal injunctive or declaratory relief should not issue when a prosecution is pending in a state court against the federal plaintiff, do not preclude federal equitable intervention, at least under the facts of this case. See Thoms v. Heffernan, No. 72–1013, 473 F.2d 478 (2d Cir. 1973); Note, Implications of the Younger Cases for the Availability of Federal Equitable Relief When No State Prosecution is Pending, 72 Colum.L.Rev. 874; Hull v. Petrillo, 439 F.2d 1184, 1186 n.1 (2d Cir. 1971). Cf. Abele v. Markle, 452 F.2d 1121 (2d Cir. 1971). As of August 2, 1972, the date of the initiation of the federal suit, no state case was pending; in fact no liability attached until August 3, 1972.

■ We are also persuaded that a justiciable controversy is presented. Neither *Younger*, nor Boyle v. Landry, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971), precludes a showing of such a controversy. See Thoms v. Heffernan, No. 72–1013, 473 F.2d 478 (2d Cir. 1973); Abele v. Markle, 452 F.2d 1121 (2d Cir. 1971). Here the denial of the beach passes and the service of the notice of July 28 overcome any justiciability barrier.

■■ It is further settled that the anti-injunction statute, 28 U.S.C. § 2283[5] does not bar enjoining *future* state court proceedings, Dombrowski v. Pfister, 380 U.S. 479, 484 n.2, 85 S.Ct. 1116, 14 L.Ed.2d 22, (1965); see Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), and that 42 U.S.C. § 1983 constitutes a congressionally carved out exception to the anti-injunction statute. Mitchum v. Foster, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972).

■ Finally, we agree with Judge Dooling that absention is not warranted. We are not here confronted with a situation where state court resolution of an unclear state statute might obviate the

---

4. Boyle v. Landry, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971); Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971); Perez v. Ledesma, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971); Dyson v. Stein, 401 U.S. 200, 91 S.Ct. 769, 27 L.Ed.2d 781 (1971); Byrne v. Karalexis, 401 U.S. 216, 91 S.Ct. 777, 27 L.Ed.2d 792 (1971).

5. The "Anti-Injunction" statute provides: "A court of the United States may not grant an injunction to stay proceedings in a state court except as expressly authorized by act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283 (1965).

necessity to decide federal constitutional questions. See Railroad Commission v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). It is unlikely that New York courts would find Belle Terre's zoning ordinance *ultra vires* the state enabling legislation, N.Y. Village Law, §§ 175, 177 (McKinney 1966), since similar zoning classifications grounded on the concept of "natural families" have been sustained. See, e.g., City of Schenectady v. Alumni Association of Union Chapter, 5 A.D.2d 14, 168 N.Y.S.2d 754 (3d Dept. 1957). Moreover, as Judge Dooling noted:

> "In the present case a state court decision holding that the ordinance, construed as the village has construed it, was beyond the authority granted to the village by the New York Village Law, could apparently be based only on the argument that to hold otherwise would impose on . . . the Village Law an unconstitutional interpretation. Any unresolved question of the state law detectable here is, therefore, the federal question differently stated." Cf. Wisconsin v. Constantineau, 400 U.S. 433, 438–439, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971).

*The Merits*

Turning to the merits, it is undisputed that the Belle Terre zoning ordinance restricts appellants in the exercise of their rights with respect to the use of land in the Village and that it is ·discriminatory and unequal to the extent that, while traditional families of more than two members may occupy a one-family dwelling, groups of more than two unrelated individuals (sometimes described as "voluntary" families)· are prohibited from doing so. The basic issue before us is whether this unequal legislative classification violates the Equal Protection Clause.

■ In approaching that issue we start on the premise that almost every local zoning ordinance represents a restriction upon citizens' freedom of action in the exercise of otherwise lawful and constitutional rights with respect to the use of their land, whether it be in the operation of a business or the construction of a home. Where such regulations represent a valid exercise of delegated state police power and are designed to promote or protect the public health, safety or welfare, the individual's right must give way to the particular concern of the community, Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S. Ct. 114, 71 L.Ed. 303 (1926); Zahn v. Board of Public Works, 274 U.S. 325, 47 S.Ct. 594, 71 L.Ed. 1074 (1927); Nectow v. City of Cambridge, 277 U.S. 183, 48 S.Ct. 447, 72 L.Ed. 842 (1928); cf. Carmichael v. Southern Coal & Coke Co., 301 U.S. 495, 57 S.Ct. 868, 81 L.Ed. 1245 (1937).

■ The right of an individual or of a group, related or otherwise, to live together does not necessarily guarantee complete freedom as to the location, construction, or living conditions, without regard to reasonably based zoning laws. In enacting zoning legislation the local authorities are vested with broad discretion. Ordinarily a court will intervene to declare a zoning ordinance to be a denial of due process only where it cannot be supported by a substantial public interest. Traditionally it may be justified by showing that it is related to such matters as safety, population density, adequacy of light and air, noise and necessity for traffic control, transportation, sewerage, school, park and other public services. More recently, promotion of the aesthetic aspects of a town has been upheld as a legitimate zoning objective, e.g., United Advertising Corp. v. Borough of Metuchen, 42 N.J. 1, 198 A.2d 447 (1964).

From the very outset of its consideration of the constitutionality of local zoning laws, which were then attacked under the Due Process Clause, the Supreme Court laid down a basic principle:

> "The governmental power to interfere by zoning regulations with the general rights of the land owner by restricting the character of his use, is not unlimited, and, other questions aside,

such restriction cannot be imposed if it does not bear a substantial relation to the public health, safety, morals, or general welfare." Nectow v. City of Cambridge, 277 U.S. 183, 188, 48 S.Ct. 447, 448, 72 L.Ed. 842 (1928).

■ To the requirement that zoning laws satisfy due process, as thus enunciated by *Euclid* and its brethren, there must be added the important condition that they not discriminate in violation of the Equal Protection Clause. While some inequalities may be tolerated, Williamson v. Lee Optical Co., 348 U.S. 483, 75 S.Ct. 461, 90 L.Ed. 563 (1955), a law which might otherwise be upheld as a valid exercise of police power will be struck down where it classifies on the basis of impermissible criteria, such as race. Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967); Kennedy Park Homes Association v. City of Lackawanna, 436 F.2d 108 (2d Cir. 1970), cert. denied, 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971).

Turning to the present case, appellants urge that since the Belle Terre ordinance impinges upon constitutionally protected rights and interests characterized by them as "fundamental," i.e., their rights of privacy, of association and of travel, as well as their freedom to live with whom they please, cf. Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), the challenged legislation must be struck down for the reason that it is not shown to be supportable by a "compelling state interest." See Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). Appellees, on the other hand, argue that if, upon judicial hypothesis, any state of facts might be conceived of which would indicate a rational zoning basis for the ordinance, it must be sus-

tained. Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78 (1911), 31 S.Ct. 337, 55 L.Ed. 369; McGowan v. Maryland, 366 U.S. 420, 426, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). They suggest that since the ordinance might conceivably be justified as a measure designed to curb population density and excessive rental costs, or to preserve the traditional family character of the neighborhood, it must be upheld.

With respect to appellants' contention that the rights invoked by them should be classified as "fundamental," we note that the interests thus identified by the Supreme Court have been few in number. They include the right to travel, Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), the right to vote, Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); Harper v. Virginia Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), and the right to the essential facilities for prosecution of a criminal appeal, Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956). Despite vigorous efforts to extend the characterization into other fields, including exclusionary zoning,[6] the list of so-called "fundamental" rights has not been expanded. At its last term the Supreme Court declined to classify as "fundamental" the right to housing, Lindsey v. Normet, 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972), and reaffirmed its similar views with respect to welfare payments, Jefferson v. Hackney, 406 U.S. 535, 546, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972); Richardson v. Belcher, 404 U.S. 78, 81, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971); Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).

Unquestionably the rights claimed by appellants are important. Certainly they are more personal and basic in na-

---

6. Note, The Equal Protection Clause and Exclusionary Zoning After Valtierra and Dandridge, 81 Yale L.J. 61 (1971); Sager, Tight Little Islands: Exclusionary Zoning, Equal Protection, and the Indi-

gent, 21 Stan.L.Rev. 767 (1969); Comment, All In The "Family": Legal Problems of Communes, 7 Harv.Civ.Rights—Civ.Lib.L.Rev. 393 (1972).

814

ture than those of commercial interests of the type under consideration in *Lindsley, supra,* and *McGowan, supra.* On the other hand, this case does not present us with discrimination against racial minorities or the poor. Note, The Equal Protection Clause and Exclusionary Zoning After Valtierra and Dandridge, 81 Yale L.J. 61 (1971); Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920 (2d Cir. 1968). Nor does the present case fit snugly into any of the other categories recognized as requiring application of the compelling state interest test. Despite the incidental effects of the Belle Terre ordinance, we are not here dealing with a "suspect" classification such as race, Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), or alienage, Graham v. Richardson, 403 U.S. 365, 91 S. Ct. 1848, 29 L.Ed.2d 534 (1971), or with a law directed against a right of association sought as a means of political expression or action, e. g., NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L. Ed.2d 1488 (1958); Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1969); Bates v. Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960), or as a means of obtaining access to the courts, NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963).

 It may be that the underlying purpose of the Belle Terre statute is to regulate the intimate moral behavior of its residents within their "zone of privacy," Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), and that its effect has been to curb the right to travel of those who wish to live in Belle Terre. Shapiro v. Thompson, 394 U.S. 617, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). Belle Terre, however, claims that these are not pur-

poses of its zoning law. Fortunately we do not have to decide whether there has been an infringement of the right of privacy or travel because we believe that we are no longer limited to the either-or choice between the compelling state interest test and the minimal scrutiny permitted by the *Lindsley-McGowan* formula. Faced recently with the issue under similar circumstances the Supreme Court appears to have moved from this rigid dichotomy, sometimes described as a "two-tiered" formula,[7] toward a more flexible and equitable approach, which permits consideration to be given to evidence of the nature of the unequal classification under attack, the nature of the rights adversely affected, and the governmental interest urged in support of it. Under this approach the test for application of the Equal Protection Clause is whether the legislative classification is *in fact* substantially related to the object of the statute. Eisenstadt v. Baird, 405 U.S. 438, 446–455, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); Reed v. Reed, 404 U.S. 71, 76, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), see James v. Strange, 407 U.S. 128, 140–141, 92 S.Ct. 2027, 32 L.Ed.2d 600 (1972); Jackson v. Indiana, 406 U.S. 715, 723–730, 92 S.Ct. 1845, 32 L.Ed.2d 285 (1972); Weber v. Aetna Cas. & Sur. Co., 406 U.S. 164, 172–176, 92 S.Ct. 1396, 31 L.Ed.2d 768 (1972). This approach is suggested by language of Royster Guano Co. v. Virginia, 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989 (1920), and of a distinguished commentary, e. g., Tussman & tenBroek, The Equal Protection of the Laws, 37 Cal.L.Rev. 341, 344–353, 365–368 (1949). If the classification, upon review of facts bearing upon the foregoing relevant factors, is shown to have a substantial relationship to a lawful objective and is not void for other reasons, such as overbreadth, it will be upheld. If not, it denies equal protection.

"A classification 'must be reasonable, not arbitrary, and must rest upon

7. See Gunther, The Supreme Court 1971 Term, Foreword, In Search of Evolving Doctrine on a Changing Court: A Model

for a New Equal Protection, 86 Harv.L. Rev. 1, 10–20 (1972).

some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.' Royster Guano Co. v. Virginia, 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989 (1920). The question presented by this case, then, is whether a difference in the sex of competing applicants for letters of administration bears a rational relationship to a state objective that is sought to be advanced by the operation of §§ 15–312 and 15–314.

\* \* \* \* \* \*

"The crucial question, however, is whether § 15–314 advances that objective in a manner consistent with the command of the Equal Protection Clause. We hold that it does not." Reed v. Reed, 404 U.S. 71, 76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 (1971).

In thus being required to focus on the actual rationality of the legislative means under attack, we are asked to do what courts are historically suited to do —apply the law to factual contexts rather than accept one hypothetical legislative justification to the exclusion of others that represent the true rationale of the classification.[8] This more realistic judicial scrutiny in cases in which the compelling state interest test is not invoked serves to render the Equal Protection Clause effective rather to permit all but egregious inequalities to go unchecked, as was sometimes the case under the minimal scrutiny test. This approach is particularly appropriate in cases of the present type, where individual human rights of groups as opposed to business regulations are involved. See United States v. Carolene Products Co., 304 U.S. 144, 152–153 n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938); Tussman & tenBroek, *supra* at 373.

■■■ Turning to the question of whether the Belle Terre ordinance may be sustained upon application of the foregoing principles, we start by examination of the sole ground upon which it was upheld by the district court, namely the interest of the local community in the protection and maintenance of the prevailing traditional family pattern, which consists of occupancy of one-family houses by families based on consanguinity or legal affinity. In our view such a goal fails to fall within the proper exercise of state police power. It can hardly be disputed—and the district court so found—that the ordinance has the purpose and effect of permitting existing inhabitants to compel all others who would take up residence in the community to conform to its prevailing ideas of lifestyle, thus insuring that the community will be structured socially on a fairly homogeneous basis. Such social preferences, however, while permissible in a private club, have no relevance to public health, safety or welfare. See Kirsch Holding Co. v. Borough of Manasquan, 59 N.J. 241, 281 A.2d 513 (1971); City of Des Plaines v. Trottner, 34 Ill.2d 432, 216 N.E.2d 116 (1966); cf. Moreno v. U. S. Dept. of Agriculture, 345 F.Supp. 310 (D.D.C.) (three-judge court) (per McGowan, Cir. J.), prob.

8. We disagree with our Brother Timbers' interpretation of our decision as requiring the court to apply a flexible standard based upon balancing of the importance of the respective conflicting governmental and private interests affected by the legislation under review. We believe simply that the court is required to determine whether the legislative classification *in fact* (rather than hypothetically) has a substantial relationship to a lawful objective. That determination of necessity requires the court to consider evidence of the nature of the classification under attack, the rights adversely affected and the governmental interest in support of it.

We agree with Judge Timbers' conclusion that in determining whether legislation under review denies equal protection "grossly overinclusive or underinclusive classifications should not be readily tolerated." However, for reasons stated below (at 2010–2014) we conclude that even assuming *arguendo* that the Belle Terre ordinance had a legitimate objective, the means adopted cannot be justified under this standard.

jur. noted, 409 U.S. 1036, 93 S.Ct. 526, 34 L.Ed.2d 485 (1972).

■ The effect of the Belle Terre ordinance would be to exclude from the community, without any rational basis, unmarried groups seeking to live together, whether they be three college students, three single nurses, three priests, or three single judges. Although local communities are given wide latitude in achieving legitimate zoning needs, they cannot under the mask of zoning ordinances impose social preferences of this character upon their fellow citizens. To permit such action would be to invite, upon similar guise, zoning laws that would restrict occupants to those having no more than two children per family, those employed within a given radius, those earning a minimum income, or those passing muster after interview by a community "Admissions Committee." While such selective exclusion may be practiced by private institutions, it cannot be tolerated on the part of a governmental body such as Belle Terre, which is bound to serve the public.

Even assuming *arguendo* that a social predilection in the form of entrenched traditional family units constituted a valid zoning objective, we fail to find a shred of rational support for the means used here to achieve that end. It is not suggested that appellants or unrelated groups functioning as a single housekeeping unit, endanger the health, safety, morals or welfare of existing residents of the community. The most that can be said is that they differ from existing residents solely because of lack of blood or marriage ties.

■ Appellees urge that regardless whether social preferences may or may not form a valid basis for upholding the ordinance, it should nevertheless be sustained on the ground that it has a rational basis in traditionally recognized zoning objectives. It is suggested, for instance, that the ordinance is justified as a means of controlling population density. This contention is based on the assumption that the number of related persons in the conventional family unit (husband, wife, brothers, sisters, children, nephews, uncles, grandparents) tends to be "self-limiting," whereas in the absence of a regulation limiting the number of unrelated occupants, the "voluntary" family can be limitless in size. Another argument advanced by appellees is that the ordinance might avoid escalation of rental rates, which would price traditional families out of the market, since it is possible that unrelated groups would be willing to pay higher rentals than would consanguineal families. We are further asked to speculate that "voluntary" families would pose greater parking, traffic and noise problems than would traditional families and that there would be a greater degree of transiency on the part of the former than the latter, thus weakening the stability of the community.

If some or all of these hypothesized objectives were supportable, some form of such ordinance might conceivably be upheld as a valid exercise of state police power. Upon the record before us, however, we fail to find a vestige of any such support. To theorize that groups of unrelated members would have more occupants per house than would traditional family groups, or that they would price the latter out of the market or produce greater parking, noise or traffic problems, would be rank speculation, unsupported either by evidence or by facts that could be judicially noticed. We are here constrained to adhere to Judge Dooling's observation that "Such a restricted zoning district might well be all but impossible to justify if it had to be strictly justified by its service of such familiar zoning objectives as safety, adequate light and air, preservation of the lands from overintensive use, avoiding crowding of the population, reduction of traffic congestion and facilitation of adequate transportation, water, sewerage, school, park and other public services."

"In terms of permissible zoning objectives, a group of persons bound together only by their common desire to operate a single housekeeping unit,

might be thought to have a transient quality that would affect adversely the stability of the neighborhood, and so depreciate the value of other property. An ordinance requiring relationship by blood, marriage or adoption could be regarded as tending to limit the intensity of land use. And it might be considered that a group of unrelated persons would be more likely to generate traffic and parking problems than would an equal number of related persons.

"But none of these observations reflects a universal truth. Family groups are mobile today, and not all family units are internally stable and well-disciplined. Family groups with two or more cars are not unfamiliar. And so far as intensity of use is concerned, the definition in the present ordinance, with its reference to the 'respective spouses' of persons related by blood, marriage or adoption, can hardly be regarded as an effective control upon the size of family units." City of Des Plaines v. Trottner, 34 Ill.2d 432, 434, 216 N.E.2d 116, 119 (1966) (per Justice Schaefer).

Even if the Belle Terre ordinance could conceivably have a legitimate zoning objective, the classification established may well be vulnerable as too sweeping, excessive and over-inclusive. See Kirsch Holding Co. v. Borough of Manasquan, 59 N.J. 241, 281 A.2d 513 (1971); cf. Developments in the Law—Equal Protection, 82 Harv.L.Rev. 1065, 1082–1087 (1969). For instance, if it were aimed at maintaining population density at the level of traditional family units, it would not limit the number of unrelated occupants to two (2) persons per one-family dwelling, which admittedly is smaller than the size of the average family. Assuming such a purpose, a more permissive ordinance would suffice. Furthermore, such an objective could be achieved more rationally and without discrimination against unrelated groups by regulation of the number of bedrooms in a dwelling structure, by restriction of the ratio of persons to bedrooms, or simply by limitation of occupancy to a single housekeeping unit. Public and private nuisance laws should provide an adequate remedy to curb noise or other forms of pollution on the part of occupants of a dwelling, regardless of their relationship to each other.

If the objective of the ordinance were to avoid rent inflation, the simple remedy would be adoption of rent controls rather than the exclusion of a class of people from the community. Lastly, disregarding the absence of evidence to support the suggestion that the ordinance might constitute a means of controlling traffic, parking or noise, there exist a wide variety of local legislative enactments by which these objectives could be accomplished without impinging upon the rights of privacy and association of unrelated persons. If a problem of excessive automobiles existed, it could be met simply by restricting the number of cars per dwelling unit, regardless of the relationship of its occupants.

Nor are we persuaded to sustain the Belle Terre ordinance by the fact that dormitory housing is available to appellants at Stony Brook or one-family housing available in other nearby communities which have not enacted exclusionary zoning of the type here under attack. The fact that an unconstitutional ordinance is limited in geographical scope does not make it any less an abridgement of guaranteed constitutional rights. See Buchanan v. Warley, 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149 (1917); Murdock v. Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943). Appellants are entitled, subject to lawful and reasonable local laws, to travel and settle down where they please. See King v. New Rochelle Municipal Housing Authority, 442 F.2d 646, 648 (2d Cir. 1971); Cole v. Housing Authority, 435 F.2d 807 (1st Cir. 1970), affirming 312 F.Supp. 692 (D.R.I.1970). If Belle Terre is permitted to exclude appellants from its borders, other nearby communities, in the absence of a coordinated, enforceable regional plan, may be expected to do likewise. Indeed,

many already have.[9] The availability of housing in another community, therefore, does not constitute a defense. Carried to its logical conclusion such an argument might, after all local communities in an entire area had adopted unjustifiable exclusionary zoning laws, relegate those discriminated against, in this age of the jet plane and superhighway, to distant regions or even to other states.

Lastly we note that in most cases similar zoning classifications have been found invalid. See City of Des Plaines v. Trottner, 34 Ill.2d 432, 216 N.E.2d 116 (1966); Kirsch Holding Co. v. Borough of Manasquan, 59 N.J. 241, 281 A. 2d 513 (1971). In an analogous context a three-judge court has struck down a legislative classification which limited eligibility for food stamps to "related" individuals living as one economic unit sharing common cooking facilities and excluded groups of unrelated individuals similar to appellants here. Moreno v. United States Dept. of Agriculture, 345 F.Supp. 310 (D.D.C.), prob. jur. noted, 409 U.S. 1036, 93 S.Ct. 526, 34 L.Ed.2d 485 (1972). We find Palo Alto Tenants Union v. Morgan, 321 F.Supp. 908 (N. D.Cal.1970), relied on by appellees, to be unpersuasive. Although the court there upheld a similarly defined "single family" zoning ordinance under restrained equal protection scrutiny, it also found, unlike the district court here, that the ordinance was rationally related to population density control, traffic control and maintenance of lower rental rates.

## Conclusion

■ The discriminatory classification created by the Belle Terre ordinance does not appear to be supported by any rational basis that is consistent with permissible zoning objectives. Since appellants have shown a strong likelihood of success on the merits and the balance of hardships tips decidedly in their favor, the prerequisities for preliminary injunctive relief have been established. Checker Motors Corp. v. Chrysler Motors Corp., 405 F.2d 319 (2d Cir.), cert. denied, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969).

Accordingly the order of the district court is reversed and the case remanded for further proceedings consistent with this opinion.

TIMBERS, Circuit Judge (dissenting):

The Village of Belle Terre, a community of 700 people, has enacted a "one-family" zoning ordinance similar to those in effect in thousands of communities throughout the Nation. Six unmarried students—three males and three females—at the State University of New York at Stony Brook, claiming that they constitute "one-family", have leased a house in Belle Terre for the purpose of living there together. The Village says its one-family ordinance prohibits such a group living there. The students, in their civil rights action brought in the district court below, challenge the constitutionality of the ordinance. After a hearing in the district court, Judge Dooling, in a most thoughtful and perceptive opinion (E.D.N.Y. 1972), upheld the validity of the ordinance and denied a preliminary injunction against its enforcement. The majority in our Court today reverses the district court and strikes down the Village's zoning ordinance on the ground that it violates the equal protection clause of the United States Constitution. I disagree.

First, while I recognize that the Supreme Court appears to be casting aside the rigid old equal protection-new equal protection dichotomy, I believe that the majority in our Court incorrectly perceives the essence of the new standard

9. See, e. g., Building Zone Ordinance of Village of Babylon, Art. I, § 100(28); Building Zone Ordinance of Village of Sag Harbor, Art. II, § 1(d); Ordinances of the Village of Bellport, Ch. 10, Art. II, § 206.1; Zoning Ordinance, General Regulations of Town of East Hampton, § 309.5; Unified Code of Ordinances, The Village of Oldfield, Art. VII, Ch. 7, Zoning, Part 7.2.

being developed. Since our decision will have radiations far beyond the immediate controversy, I feel compelled to state my understanding of the Supreme Court's latest equal protection decisions and the new standard of judicial review that they require.

Secondly, I disagree with the majority on the merits of the instant controversy. In my view since the Belle Terre zoning ordinance bears a significant relationship to the traditionally recognized zoning objectives asserted by appellees, it satisfies the new equal protection standard.

### I.

In the century that has passed since the equal protection clause became part of our Constitution, two well-defined equal protection standards have been established: the "minimal scrutiny" standard and the "strict scrutiny" standard.

A good definition of the "minimal scrutiny" standard or test was articulated by Chief Justice Warren in McGowan v. Maryland, 366 U.S. 420, 425–26 (1961):

"[The equal protection clause] permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective . . . . A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it."

This deferential test, also known as the "old equal protection", was utilized most

often where economic or social legislation was being challenged. See, e. g., Williamson v. Lee Optical Co., 348 U.S. 483 (1955); Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78 (1911).

The "strict scrutiny" test involved a more intense and interest-balancing review of legislative means and ends. It required that the governmental purpose for legislation be "compelling" and that the intrusion upon individual rights caused by a legislative classification be "necessary" to the effectuation of this "compelling" purpose. See Shapiro v. Thompson, 394 U.S. 618 (1969). This interventionist test, also known as the "new equal protection", was applied where a classification provided for differential treatment on the basis of race, Loving v. Virginia, 388 U.S. 1 (1967), or where a neutral classification in fact adversely affected the fundamental rights of a disadvantaged group. See Harper v. Virginia Bd. of Elections, 383 U.S. 663 (1966) (voting rights); Griffin v. Illinois, 351 U.S. 12 (1956) (right to an effective criminal appeal); Shapiro v. Thompson, *supra* (right of interstate travel).

The majority here asserts that certain recent decisions of the Supreme Court [1] indicate that a third standard of review —an equal protection standard of intermediate scrutiny—is in the process of evolution. This standard is described by the majority as "a more flexible and equitable approach, which permits consideration to be given to evidence of the nature of the unequal classification under attack, the nature of the rights adversely affected, and the governmental interest urged in support of it." The test proposed by the majority is that "[i]f the classification, upon review of

---

1. The majority relies primarily upon five decisions to support its formulation of a new rationality standard: James v. Strange, 407 U.S. 128 (1972); Jackson v. Indiana, 406 U.S. 715 (1972); Weber v. Aetna Casualty & Surety Co., 406 U.S. 164 (1972); Eisenstadt v. Baird, 405 U.S. 438 (1972); Reed v. Reed, 404 U.S. 71 (1971). Additional decisions might be cited to indicate that the Court recently may have been developing a third standard of review: Chicago Police Dept. v. Mosley, 408 U.S. 92 (1972); Humphrey v. Cady, 405 U.S. 504 (1972). See generally Gunther, The Supreme Court 1971 Term, Foreword, In Search of Evolving Doctrine on a Changing Court: A Model for A New Equal Protection, 86 Harv.L.Rev. 1 (1972).

facts bearing upon the foregoing relevant factors, is shown to have a substantial relationship to a lawful objective and is not void for other reasons, such as overbreadth, it will be upheld." The majority further states that under the new test courts are "asked to do what courts are historically suited to do—apply the law to factual contexts rather than accept one hypothetical legislative justification to the exclusion of others that represent the true rationale of the classification." I believe that the intensity and focus of judicial review required by the decisions cited by the majority differs substantially from the intensity and focus of the test proposed by the majority and applied by the majority to the present controversy.

James v. Strange, 407 U.S. 128 (1972), a unanimous decision, probably is the best example of the Court's new policy of judicial intervention without "strict scrutiny". That decision held unconstitutional a Kansas statute for recoupment of legal defense fees expended for indigent defendants. What the Court found offensive about the statute was that a debtor in a recoupment action could not avail himself of a number of protective exemptions—including some restrictions on wage garnishment —afforded to other civil judgment debtors. It held that the distinction between these debtors and other civil judgment debtors with regard to the exemptions violated the equal protection clause because it was not based on "some rationality".

In Jackson v. Indiana, 406 U.S. 715 (1972), the Court held that the state's provisions for pretrial commitment of mentally incompetent criminal defendants violated the equal protection clause. A comparison of the commitment laws applicable to a criminal defendant with those governing commitment of persons not charged with offenses disclosed that criminal defendants were subject to more lenient commitment standards and to a more stringent release standard. Accepting as legitimate the proffered state objective in committing criminal defendants, the Court decided that the difference between commitment procedures was not supported by any rational basis related to this objective.

Weber v. Aetna Casualty and Surety Co., 406 U.S. 164 (1972), invalidated a statute which discriminated between legitimate children and dependent, unacknowledged legitimates in awarding workmen's compensation benefits for the death of a common father. The Court held that the discrimination against illegitimates bore "no significant relationship to those recognized purposes of recovery which workmen's compensation statutes commendably serve." 406 U.S. at 175.

The two decisions chiefly relied upon by the majority here, Eisenstadt v. Baird, 405 U.S. 438 (1972), and Reed v. Reed, 404 U.S. 71 (1971), strike me as not truly illustrative of the intensity and focus of review associated with the evolving equal protection standard. In both *Baird* and *Reed,* the Court did specify that the test being applied was a means-scrutiny test: whether the means actually were rationally related to a valid public purpose. But the actual scrutiny engaged in by the Court in each case seems more intense than required under the means-scrutiny test as defined.

In *Reed,* the Court held unconstitutional an Idaho probate provision which gave men a mandatory preference over women when persons of the same priority class applied for appointment to administer a decedent's estate. Chief Justice Burger found "some legitimacy" in the state's proffered objective to simplify probate proceedings. Yet in testing the means solely as related to that aim the Court held that the sex classification was "arbitrary". It seems clear that the means did contribute substantially to the state's purpose, and that the rationality test was met. The more intense review engaged in by the Court, more characteristic of the strict scrutiny test than of the new rationality test, apparently reflected an unexpressed special suspicion of sex classifications.

In *Baird,* the Court struck down Massachusetts; ban on the distribution of contraceptives to unmarried persons. The Court reached this result, however, by scrutinizing the legislation far more vigorously than it would have under the means-scrutiny standard. It rejected, as appropriate measures of the rationality of the means, two of the purposes in fact asserted by the state. The only purpose it found credible was a ban on contraceptives as such. It then stated that a distinction between married and unmarried persons was not rationally related to this objective. The Court appears to have reached a judgment as to the legitimacy of the ends by measuring their value against the individual interests affected. Since the interests involved were closely related to those protected in Griswold v. Connecticut, 381 U.S. 479 (1965), the Court was justified in subjecting the statute to intense scrutiny.

The *James, Jackson* and *Weber* decisions clearly indicate that the Court is not content with the two-tier equal protection doctrine and they may well presage a new equal protection standard.[2] Such standard would require modest intervention by a court to assure rationality of legislative means but without restricting legislative prerogatives regarding ends. Unlike the "strict scrutiny" test, the importance of the governmental interests apparently would not be weighed against the importance of the private interests impaired by the legislation. Courts would not defer to a broad range of imaginable legislative purposes, but if the ends proffered by the state were legitimate, and no right or value which has clear support in constitutional text and history were adversely affected,

conflicting values would not be required to be weighed. The inquiry thus would be scrupulously focused on means rather than ends.

The majority here states that "the nature of the right affected" should in part determine the rationality of the means. This indicates that the more "valuable" the right affected, the more intense should be the scrutiny and the more rational must be the means to achieve the objective. I do not find any support for this principle in the Supreme Court cases. In each of the decisions, except *Reed* and *Baird,* the intensity of review was of the same degree although the interests affected were different. A "sliding scale" approach may be appropriate in some contexts, but it seems to me to be inappropriate here. A court should not be required to attempt the impossible task of first assessing the precise value of a right or interest[3] and then increasing or decreasing the intensity of its scrutiny accordingly. This approach would confer upon a judge wide discretion to overturn state and local legislation based largely on his own estimate of the value of competing interests—a highly abstract and individualistic determination.

The recent Supreme Court decisions, in my view, require a judge to make only the narrow value judgments needed in evaluating means. A legislative classification must contribute substantially to the achievement of the state's purpose. It must "rest on a ground of difference having a fair and substantial relation to the object of the legislation." Reed v. Reed, *supra,* 404 U.S. at 76. This would indicate that grossly overinclusive or underinclusive classifications should not be readily tolerated. Nor

---

2. Four decisions rendered by the Court last term indicate that it is not yet ready to abandon the "old equal protection" standard. Jefferson v. Hackney, 406 U.S. 435 (1972); Lindsey v. Normet, 405 U.S. 56 (1972); Schill v. Knebel, 404 U.S. 357 (1971); Richardson v. Belcher, 404 U.S. 78 (1971).

3. The difficulty in judging the relative value of an interest is illustrated by the Court's hesitancy in expanding the list of "fundamental interests". See, e. g., Lindsey v. Normet, 405 U.S. 56 (1972) (refusal to find housing a fundamental interest). Indeed, the Court's use of the new means-scrutiny test may be viewed as a technique to avoid the troublesome value judgments required to identify new fundamental interests.

should a reviewing court defer to imaginable facts that might justify the classification. But account should be taken of legislative realities and the need for legislative flexibility. In short, a legislature should be able to adopt any means that are reasonably effective in achieving a valid legislative end or ends.

## II.

The Belle Terre ordinance clearly was not devised, nor has it been enforced, so as to discriminate against any group because of its racial, religious, or political characteristics. Reitman v. Mulkey, 387 U.S. 369 (1967). It does not operate to exclude the indigent from the Village. Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920 (2 Cir. 1968). Appellants have not shown infringement of a constitutional right to freedom of association, NAACP v. Alabama ex rel. Patterson, 357 U.S. 449 (1958), or a right of privacy. Griswold v. Connecticut, 381 U.S. 479 (1965). While appellants' rights to live together under the same roof free from the intrusion of government are said to be important, in my view such rights do not rise to the status of "fundamental interests". In short, the "strict scrutiny" standards should not be applied to test the validity of the ordinance.

The majority believes that the new rationality test should be applied to zoning ordinances such as the Belle Terre ordinance. To me, it is not clear, however, that the Supreme Court is prepared to apply this invigorated rational basis for review to traditional "hands-off" areas of legislative activity. And I have my doubts that we should do so under our own steam. During this last term, the Supreme Court continued its reluctance to explore the welfare area when it found minimal rationality after examining legislation which discriminated in the allocation of welfare funds. Jefferson v. Hackmen, 406 U.S. 535 (1972); Richardson v. Belcher, 404 U.S. 78 (1971). See also Dandridge v. Williams, 397 U.S. 471 (1970). In the past, zoning has been another area which the Court traditionally has declined to explore. Euclid v. Ambler Realty Co., 272 U.S. 365 (1926). I therefore am more disinclined than is the majority to apply an intensified means-scrutiny test to this uncharted area of the law.

For discussion purposes, however, I shall assume arguendo that the new standard of review should be applied to the Belle Terre ordinance.

The Village of Belle Terre asserts that the primary purpose of its zoning ordinance is to maintain the one-family residential character of the Village for the welfare of its residents. The majority holds that this is not a valid zoning objective and, further, that the ordinance is not a rational means of achieving that objective. While I find it unnecessary to decide this difficult issue, because the ordinance is rationally related to other well-accepted zoning objectives, the majority's treatment of the subject deserves some discussion.

I believe that under the circumstances here the maintenance of the traditional family character of the Village arguably is a legitimate objective. It may be doubtful whether a local government in preplanning the development of a community could set aside an area solely for single-family dwellings with "family" defined as persons related by consanguinity or legal affinity, or as not more than two unrelated persons. But that is not the case here. The Belle Terre ordinance apparently was enacted for the purpose of zoning for a particular neighborhood character in a community that had always been of that character. The development decision was made over a period of time by the families moving into the Village. The zoning ordinance therefore merely reinforced the sum of many individual choices. See Mandelker, Managing Our Urban Environment 707 (2d ed. 1971).

It is significant also that appellants have available to them similar housing in nearby areas. In assessing the legitimacy of a use limitation upon a particular area, a court should not ignore a rel-

evant, larger pattern of development. As Judge Dooling stated below:

"The safeguard against mistaking the effect of a particular ordinance is to see it in its total setting, recognizing that its effect, and, therefore, its validity, may be influenced by the way in which neighboring communities are zoned."

If the zoning ordinance of a small community is viewed from this broader perspective, its maintenance of a particular neighborhood character may not be seen as an expression of a parochial and exclusionist attitude, but instead as the proper use of the general welfare power to establish one segment of a beneficial larger scheme. A look at the entire Brookhaven area, which provides for varying uses and activities, indicates that Belle Terre's ordinance was a proper exercise of the general welfare power.

Certainly the ordinance is rationally related to this objective. The Village reasonably determined that two unrelated persons living in the same household would not substantially change the character of the neighborhood. Whether the limit should have been three or four unrelated persons, is a matter on which the Village is entitled to some flexibility. The limitation clearly contributes to the objective of preserving a family neighborhood.

In addition to the objective of preserving the traditional family character of the neighborhood, the Village has specified several other purposes of the ordinance: (1) to control population density; (2) to avoid escalation of rental rates; and (3) to prevent parking, traffic and noise problems. These purposes admittedly are not the primary purposes of the ordinance, but I believe that our inquiry should not be limited to its primary purposes. Subsidiary purposes also may support the rationality of a means.

Judge Dooling observed that the ordinance "might well be all but impossible to justify if it had to be strictly justified by its service of such familiar zoning objectives" as those noted above. He did not decide whether the ordinance bore a significant relationship to these objectives. In my view, the ordinance is rationally related to each of these ends. I am reinforced in this view by the decision in Palo Alto Tenants Union v. Morgan, 321 F.Supp. 908 (N.D.Cal.1970), which upheld a zoning ordinance almost identical to the Belle Terre ordinance.[4]

The ordinance here involved obviously provides some controls over density by limiting the number of unrelated persons who may live in a single dwelling. It is argued, however, that the restriction is arbitrary because no corresponding limit is placed on the number of related persons living in a single dwelling. But traditional families do tend to be self-limiting, as the average size of a Belle Terre family (3 persons) demonstrates. Moreover, the Village has an interest in preserving the integrity of the biological or legal family and any

4. In *Palo Alto*, the court upheld a zoning law which maintained a "single family residential" neighborhood. "Single family" was defined as persons related by blood or law, or a group not exceeding four persons living as a single housekeeping unit. The law was challenged by a group of more than four unrelated persons on the ground that it violated their rights of association and privacy. Applying the restrained "minimal scrutiny" test, the court held that the classification was rationally related to control of population density, avoidance of rent inflation, and prevention of parking, traffic, and noise problems.

The cases relied upon by appellant, City of Des Plaines v. Trottner, 34 Ill. 2d 432, 216 N.E.2d 116 (1966), and Kirsch Holding Co. v. Borough of Manasquan, 59 N.J. 241, 281 A.2d 513 (N.J.Super.1971), are not persuasive. In *City of Des Plaines*, the court never reached the equal protection issue because it decided that the zoning law was ultra vires. In *Kirsch Holding Co.*, the ordinance was declared unconstitutional after the court found that its objective was to prevent obnoxious behavior by persons renting during a particular season. The court held that the ordinance limiting the area to "families" was not rationally related to this objective.

discrimination against a large family might run afoul of the Constitution. Cf. Griswold v. Connecticut, *supra.* In short, while the ordinance is not perfectly efficient, it is highly effective, given the realities of the situation. While there may be other, and perhaps more effective, means of curbing population density, the Village should be permitted to select any means that substantially further the legislative purpose. The ordinance in question clearly does so. The majority's observation that other methods of density control are available which are less intrusive upon appellants' rights strikes me as reminiscent of the "strict scrutiny" test which in my view is inapplicable here.

The ordinance also is rationally related to the avoidance of rent inflation. Large groups of unrelated persons typically have several independent sources of income while the traditional family usually has only one basic source of income. Large groups therefore are willing and able to pay a higher rent than could a family. Thus, the whole rent structure of Belle Terre may well be affected by opening the area to large, unrelated living groups. Single families who rent may be forced to move out of the area when their landlord increases the rent to a level he knows large unrelated groups can and will pay. Perhaps rent controls would have been a better solution, as the majority suggests; but the rationality test does not demand that the means employed be the best means available. The restriction on the number of unrelated persons who may live in a single dwelling bears a significant relationship to rent control.

Finally, the ordinance is related to the prevention of traffic, parking, and noise problems. These problems occur when one-family homes become occupied by large groups of unrelated persons. There are likely to be more people and more motor vehicles.

The majority holds that the ordinance is not rationally related to these objectives for three basic reasons: (1) there was no evidence presented that groups of unrelated persons are always different from traditional families with respect to these problems; (2) there were more effective methods available to the Village to solve these problems; and (3) there were methods at least equally effective available to the Village which would have been less intrusive upon appellants' rights.

The Village need not establish that there *always* is a difference between unrelated groups and families with respect to these problems. It is enough that such differences usually exist. I believe that the Village has established that fact. Moreover, since the majority applies a new standard which requires proof by the Village of rationality, and the Village apparently did not anticipate such a standard, at the very least it seems to me that a remand should be ordered to allow the Village an opportunity to prove these matters.

The fact that the means selected by the Village may not have been the most efficient or the least intrusive of those available is legally immaterial under the means-scrutiny test. If the means selected contributes substantially to the end, the equal protection clause has not been violated. It is not our function to engage in such intense review of legislation unless the classification is suspect or a fundamental interest is adversely affected.

I would affirm the judgment of the district court.

### ON DENIAL OF REHEARING EN BANC

A poll of the judges in regular active service having been taken at the request of such a judge as to whether this action should be reheard en banc and there being no majority in favor thereof, it is

Ordered that rehearing en banc is denied. Chief Judge FRIENDLY and Circuit Judges HAYS, MULLIGAN and TIMBERS dissent.

TIMBERS, Circuit Judge (dissenting from denial of reconsideration en banc):

In view of the unusual circumstances under which en banc reconsideration of this case is being denied, I think that in fairness and in the public interest I should state my reasons for dissenting from the denial of en banc reconsideration.

First, in this action involving the right of the 700 residents of the Village of Belle Terre, through their local government, to enact a one-family zoning ordinance, I have already stated in my panel dissent filed February 27, 1973, 476 F.2d at 818, the basis of my disagreement with the decision of the majority in striking down the Village's zoning ordinance on the ground that it violates the equal protection clause. The crux of my disagreement with the majority centers upon its misapprehension of the Supreme Court's most recent equal protection decisions and the new standard of judicial review that they require. Assuming arguendo that the new means-scrutiny equal protection standard (based on a *correct* reading of the Supreme Court's recent decisions) should be applied to the uncharted area of zoning ordinances, then it seems to me that the Belle Terre ordinance is valid, for it bears a significant relationship to long recognized zoning objectives.

Second, the en banc vote here is 4–4. It is another instance, during the period that our Court has consisted of eight active judges, where en banc reconsideration of a substantial question of unusual importance is being denied despite the vote of four of the active judges in favor of en banc [1]—here, Chief Judge Friendly and Circuit Judges Hays, Mulligan and Timbers.

Third, the decision of the panel majority in the instant case, when read in conjunction with recent decisions of other panels of our Court in Aguayo v. Richardson, 473 F.2d 1090 (2 Cir. 1973), and City of New York v. Richardson, 473 F.2d 923 (2 Cir. 1973), makes it virtually impossible for a district court in this Circuit, or a panel of our Court, to determine what equal protection standard to apply in a case before it.

In Aguayo v. Richardson, we dealt with an equal protection challenge to New York experimental work project programs involving families receiving assistance under the AFDC program. We noted the development of a new equal protection standard which we described as either "a replacement for the 'two-tiered equal protection' which many have found unsatisfactory, . . . or as a narrowing of the gap between the tiers." 473 F.2d at 1109. We held that the New York work project program satisfied the new standard because experimentation to determine whether improvements can be made in the welfare system is a

---

1. See, e. g., Scenic Hudson Preservation Conference v. FPC, 453 F.2d 463, 494 (2 Cir. 1971) (en banc denied, 4–4), cert. denied, 407 U.S. 926 (1972) ; Zahn v. International Paper Co., 469 F.2d 1033, 1040–42 (2 Cir. 1972) (en banc denied, 4–3, i. e. 4 in favor of en banc, 3 against), cert. granted, 410 U.S. 925 (1973), 41 U.S.L.W. 3441 (U.S. Feb. 20, 1973) ; United States v. Puco, 476 F.2d 1099, 1111 (2 Cir. 1973) (en banc denied, 4–4), (May 4, 1973).

But compare International Business Machines Corp. v. United States and Edelstein, 471 F.2d 507 (2 Cir. 1972) (en banc granted, 5–0, on February 14, 1973). It should be noted that in *IBM*, since three of the active judges were disqualified, the votes of all the remaining five active judges were required in order to en banc the case. See *Zahn, supra,* 469 F.2d at 1042. One of the five active judges concurred in the panel majority opinion. Another of the active judges wrote the panel dissenting opinion. If *either* of these two had voted against en banc, the case could not have been reconsidered en banc. Since *each* voted in favor of en banc, the desire of the other four to reconsider the case en banc was not thwarted. See International Business Machines Corp. v. United States and Edelstein, 480 F.2d 293, 303 (2 Cir. 1973) (en banc) (Timbers, J., dissenting), slip op. 3375, 3394 (May 8, 1973).

legitimate government objective. We rejected a claim that some of the details of the program were arbitrary and unreasonable, noting that " 'when it is seen that a line or point there must be, and that there is no mathematical or logical way of fixing it precisely, the decision of the legislature must be accepted unless we can say that it is very wide of any reasonable mark.' " 473 F.2d at 1110, quoting Louisville Gas Co. v. Coleman, 237 U.S. 32, 41 (1928) (Holmes, J., dissenting).

In City of New York v. Richardson, we were concerned with an attack upon New York State's requirement that residents of local social service districts contribute to the state public welfare fund on the basis of the number of welfare recipients in the local district. We held that an equal protection claim sufficiently substantial to require the convening of a three-judge district court was stated where it was alleged that the contribution system in effect required New York City residents to finance 74% of the state program where only 45% of the State's residents lived there. We reached this result by applying a new equal protection standard which we described as a "modified" rational relationship test. We observed that the Supreme Court's recent decisions indicated that "[t]he two-tiered equal protection doctrine seems to have begun to give way to a more graduated, sliding-scale test." 473 F.2d at 931.

In the instant *Boraas* case, the majority applied its own version of the new equal protection standard which it described as:

"a more flexible and equitable approach, which permits consideration to be given to evidence of the nature of the unequal classification under attack, the nature of the rights adversely affected, and the governmental interest urged in support of it." 476 F.2d at 814.

The majority's decision, striking down a village zoning ordinance which limits the number of unrelated persons who may live in a single dwelling, represents an unusually extensive judicial inquiry into regulation by local government of land use. The majority held that the ordinance was not *"in fact* substantially related" to the well-recognized zoning objectives asserted by the Village to justify its ordinance. *Id.*

In my view, the equal protection standards applied in these three decisions within a period of less than six weeks are highly inconsistent. They demonstrate an urgent need for en banc reconsideration and restatement of the proper equal protection standard to be applied. As Judge Kaufman correctly observed, "the outer boundary of [the equal protection] inquiry remains ambiguous". City of New York v. Richardson, *supra,* 473 F.2d at 931. In an area as vital as this one, we should not allow the equal protection standard to be applied by our Court to remain so uncertain pending still further decisions by our Court or by the Supreme Court. The district courts in this Circuit are called upon to decide equal protection issues with increasing frequency, and on virtually a day to day basis. It is extremely important that we provide them with immediate useful guidance rather than abandon them to make what they will of recent Supreme Court decisions or, even worse, to confuse them with a series of conflicting decisions of our own. Certainly enough has been said in recent decisions of the Supreme Court to enable us to state with reasonable assurance some general guiding principles. I would do so by granting immediate en banc reconsideration of the instant case.

Finally, the Supreme Court's very recent decision in San Antonio Independent School District v. Rodriguez, 411 U.S. 1 (1973), 41 U.S.L.W. 4407 (U.S. March 21, 1973), strongly indicates that the traditional minimal scrutiny equal protection standard should have been ap-

plied in the instant case.[2] In *Rodriguez*, the Court held that "the traditional standard of review, which requires only that the State's system be shown to bear some rational relationship to legitimate state purposes", should be applied to determine whether a Texas program for financing public education complied with the equal protection clause. 411 U.S. at 40, 41 U.S.L.W. at 4419. The Court stated that, because "the Justices of this Court lack both the expertise and the familiarity with local problems so necessary to the making of wise decisions" with respect to the financing of public education, and because "in such a complex arena . . . no perfect alternatives exist", the Court would not "impose too rigorous a standard of scrutiny." 411 U.S. at 41, 41 U.S.L.W. at 4419. In short, the Court refused to "intrude in an area in which it has traditionally deferred to state legislatures." State or local decisions regarding limitations on the use of land traditionally have been accorded this same great deference by federal courts for the same reasons a state's handling of public expenditures are not to be disturbed. Euclid v. Ambler Realty Co., 272 U.S. 365 (1926). In

the light of *Rodriguez*, it seems to me that *a fortiori* the decision in the instant case, which surely constitutes a substantial interference with a municipality's zoning policies, was erroneous. We should correct this error on our own initiative through en banc reconsideration rather than forcing the Village of Belle Terre to incur the unnecessary expenditure of time and money to obtain what would appear to be sure reversal by the Supreme Court. I do not think the Village of Belle Terre should be compelled to march up the hill for the sake of marching down again, in view of the Supreme Court's decision of a fortnight ago in *Rodriguez*.[3]

For the reasons stated above, I respectfully but most emphatically dissent from the denial of reconsideration en banc.

MANSFIELD, Circuit Judge:

Some statements in the dissent of my distinguished brother Timbers from the Court's denial of an *en banc* hearing[1] call for a reply.[2]

Most members of this Court, including our dissenting brother, have construed certain recent Supreme Court decisions

---

2. Both the majority opinion of Mr. Justice Powell and the crucial concurring opinion of Mr. Justice Stewart expressly relied upon Chief Justice Warren's opinion in McGowan v. Maryland, 366 U.S. 420, 425–26 (1961). Mr. Justice Stewart referred to *McGowan* as "[t]his settled principle of constitutional law" and as "a specific application of one of the first principles of constitutional adjudication—the basic presumption of the constitutional validity of a duly enacted state or federal law." 411 U.S. at 60, 41 U.S.L.W. at 4425.

3. I am mindful, of course, that none of us was aware of the Supreme Court's decision in *Rodriguez* at the time of the en banc poll in the instant case. That is all the more reason for reconsideration en banc now—to harmonize the law of this Circuit with controlling Supreme Court law.

1. An *en banc* review was denied pursuant to the provisions of 28 U.S.C. § 46(c) because it was not requested by a "majority of the circuit judges of the circuit who are in regular active service."

2. *En banc* review adds immeasurably to the expenditure of judicial time, energy and resources on the part of members of this already overburdened Court.

Some idea of this Court's current load of regular judicial business can be gathered from the fact that in the fiscal year 1972 it terminated 1,593 appeals, as compared with 959 appeals disposed of annually five years previously, or an increase of 66%. See Annual Report of the Director of the Administrative Office of the United States Courts for the Fiscal Year 1967, Table B1, page 181, and for the Fiscal Year 1972, Table B1, Appendix A–1. Yet the size of the Court has remained the same, with one judgeship now vacant for almost 17 months.

Nor are *en banced* appeals, with rare exceptions, disposed of expeditiously, since all members of the Court are called upon to participate in the hearing and decision. Experience reveals that the *en banc* process may delay this Court's ultimate decision of an appeal by more than six months.

as indicating a trend toward modification or softening of what had previously been interpreted as a rigid, two-tiered Equal Protection doctrine.[3] In my judgment there is no inconsistency between general observations voiced by different panels of this Court, including the majority in this case, on the subject of this apparent trend toward more elasticity in application of the basic principle of Equal Protection. But even if there were some differences in the broad language used by different panels, it would be pointless and unwise to attempt to express a standard in crystallized terms along the lines suggested by the dissent.

An *en banc* hearing would not contribute in any significant way to clarity and coherence in the area of Equal Protection for the reason that in pursuing the elusive quest for standards we are dealing with broad general principles which must be capable of adaption to widely varying factual contexts. Nothing we might say about this proteus-like concept, therefore, could be sufficiently precise to have a binding effect throughout the Circuit in other cases, which would inevitably involve significantly different factors, especially since our views would be expressed by a divided court, with district judges looking primarily to the Supreme Court for ultimate guidance. At no time has the principle of Equal Protection been articulated by the Supreme Court or by ourselves as a "litmus-paper test" or precise rule. Indeed, the Supreme Court's description of "Due Process" in Hannah v. Larche, 363 U.S. 420, 442, 80 S.Ct. 1502, 1514, 4 L.Ed.2d 1307 (1960), as an "elusive concept [whose] exact boundaries are undefinable and [whose] content varies according to specific factual contexts" applies with the same force to Equal Protection. While certainty in the law is a virtue, history discloses that resilience is equally essential. A certain degree of flexibility in describing Equal Protection must therefore be inevitable.

Nor does the Supreme Court's 5 to 4 decision in San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (Mar. 21, 1973), alter the foregoing. There the Court, following a well beaten path used in review of certain types of economic discrimination, applied "the traditional standard of review" to state legislation of an essentially economic nature, which was challenged because of its social consequences. Here we are not concerned with commercial legislation but with a local ordinance directed squarely against the personal right of individuals to associate and live together and found by the district court to be "impossible to justify" in terms of "such familiar zoning objectives as safety, adequate light and air, preservation of the lands from over-intensive use, avoiding crowding of the population, reduction of traffic congestion and facilitation of adequate transportation, water, sewerage, school, park and other public services." If anything, our decision here is in accord with the Supreme Court's decision in *Rodriguez*. In describing the standard applied by it, the Court there stated that "the Texas scheme must still be examined to determine whether it rationally furthers some legitimate, articulated State purpose" (*id.* at 17, 93 S.Ct. at 1288), that "the traditional standard of review . . . requires only that the State's system be shown to bear some rational relationship to legitimate State purposes" (*id.* at 40, 93 S.Ct. 1300), and that "[t]he constitutional standard under the Equal Protection Clause is whether the challenged state action rationally furthers a legitimate state purpose or interest" (*id.* at 55, 93 S.Ct. at 1308). These statements not only are consistent with our review

3. Aguayo v. City of New York, 2 Cir. 1973, 473 F.2d 1090 at 1108–1110 (per Friendly, Waterman, Hays, C.JJ.) ; City of New York v. Richardson, 2 Cir. 1973, 473 F.2d 923 at 930–931 (per Kaufman, Lumbard, Mansfield, C.JJ.) ; Green v. Board of Education, Jan. 29, 1973, Slip Sheet 1723 at 1726–28 (per Feinberg, Lumbard, Mansfield, C.JJ.) ; Boraas v. Village of Belle Terre, 2 Cir. 1973, 476 F.2d 806 (per Mansfield, Oakes, Timbers, C.JJ.).

but would require us to nullify the Belle Terre ordinance for failure to further any legitimate zoning objective.

This is not, therefore, one of those truly extraordinary cases that warrants review *en banc*. Nor would such a hearing render unnecessary the expenditure of time and money required to determine whether the Supreme Court will agree with our disposition of this case, since a majority of this Court might well agree with the result reached by the majority of the panel and, if it did not, appellants would undoubtedly seek review by the Supreme Court.[4] Belle Terre has open to it a simple and inexpensive solution. It can enact a new ordinance bearing some rational relationship to legitimate zoning objectives.

4. While we feel confident that our views will not be disapproved by the Supreme Court, we would not be so vain as to predict that we are "sure" of its action in this fluid area of the law.