**Richard LAWRENCE, on behalf of himself and all persons similarly situated,**

v.

**Rosalyn OAKES et al.**

**Civ. A. No. 6168.**

United States District Court,
D. Vermont.

July 16, 1973.

Steven R. Edelstein, Rutland, Vt., J. Morris Clark, Vermont Legal Aid, Inc., St. Albans, Vt., for plaintiff.

Thomas J. Kenney, Burlington, Vt., for the Commissioners and Executive Director of the Vt. State Housing Authority.

William B. Gray, Asst. U. S. Atty., for defendant Romney.

Before WATERMAN, Circuit Judge, and HOLDEN and COFFRIN, District Judges.

## OPINION AND ORDER

WATERMAN, Circuit Judge:

Plaintiff, a citizen of Vermont, currently resides with his wife and six children[1] in Charlotte, Vermont, in a small, substandard house containing a kitchen, living room, front room, and two small upstairs bedrooms. The house does not have indoor plumbing or running water, and it is only heated by a wood burning stove in the kitchen and a kerosene heater in the front room. During the winter the stove and heater do not provide sufficient heat to heat the entire house, and, as a result, plaintiff must board up the two upstairs bedrooms and crowd his whole family into the three small downstairs rooms where they eat, sleep, and spend much of their leisure time. Because the foundation of the house is unsafe, plaintiff has been told by the health officer of Charlotte that the house will be condemned as soon as he and his family move out.

Plaintiff earns about $75 per week as a farm laborer, a job which he has had for approximately the past ten years, and this income, supplemented with government-provided food stamps, constitutes his sole means of support.

For the past five or more years plaintiff has sought decent housing in, or around, Charlotte, but, because of his poverty and the large size of his family, he has been unable to locate a decent house which he can afford. In 1969 the State of Vermont, through the Vermont Housing Authority (VHA)[2] began to participate in the so-called Section 23 Leased Housing Program, which furthers the provisions of Section 23 (42 U.S.C. § 1421b) of the United States Housing Act of 1937 as amended in 1965 (42 U.S.C. §§ 1401–1430) (1970). This Section 23 leased housing program was designed as a supplementary form of low rent housing in order to provide an additional method of housing assistance for families who could not obtain public housing under earlier programs established by Sections 9 and 10 of the Housing Act. 42 U.S.C. §§ 1409–1410.[3] Under the Section 23 program, housing authorities created by the states are authorized to lease suitable housing available for lease on the private housing market, and then to sublease to low income families who qualify for public housing under income standards prescribed by the housing authority, standards which must be approved by the Department of Housing and Urban Development (HUD).[4]

---

1. In 1969, when the events leading to the commencement of this lawsuit occurred, plaintiff had nine children living with him at home. In 1971, when his original complaint was filed, one child, having reached adulthood, had left home. Since 1971 another child has left home, and a third child is living with plaintiff's sister-in-law in New York.

2. Pursuant to 24 V.S.A. § 4004a (Cum. Supp.1972) the Authority came into being on March 23, 1968 "for the purpose of improving housing conditions and facilities through federal resources and assistance in the field of low-rent housing and private accommodations." 24 V.S.A. § 4004a(d). The Authority is governed by five Commissioners appointed by the state governor and managed by an Executive Director appointed by the Commissioners. The activities of the Authority are limited to participation under Sections 10 and 23 of the United States Housing Act of 1937, as amended. See 24 V.S.A. § 4004a(d).

3. Standard public housing under Sections 9 and 10 (42 U.S.C. §§ 1409–1410) is newly constructed or rehabilitated housing (rental units) owned and operated by state-created public housing authorities. For a valuable summary of the various kinds of federally assisted housing programs in existence today see Welfeld, "A New Framework for Federal Housing Aids," 69 Col.L.Rev. 1355, 1358 (1969); Notes and Comments, "Government Housing Assistance To The Poor," 76 Yale L.J. 508 (1966–67).

4. The lease must be for a term of not less than 12 months or more than 6 years and is renewable for another term of up to 6 years. 42 U.S.C. § 1421b(d). Other mandatory provisions are as follows: (a) the Local Authority [here the Vermont Housing Authority] must reserve the sole right to determine the eligibility of families for admission and continued occupancy and the sole right to give notice to vacate; (b) the owner must

The low income family must pay 25% of its net income, determined on the basis of a federal formula, as its share of the rent, and the state-created housing authority pays the remainder of the rent out of federal funds. The purpose of the program is to take advantage of available units on the private market for the benefit of low income families who otherwise could not afford to lease them and, who, as a result, would be forced to reside in slums, or in substandard dwellings.

When Congress created the leased housing program it specifically provided that as a condition of the operation of Section 23 in a local community a state-created housing authority must, prior to operating the program in that community, obtain the approval of the governing authority of that community.[5] 42 U.S.C. § 1421b(a)(2). For Vermont, HUD has interpreted this provision as meaning that the VHA, before it may operate Section 23 in any town, must obtain the approval of the selectmen of that town. In 1969 the VHA had information that plaintiff was eligible to participate in the leased housing program and that he could benefit from its utilization in Charlotte. Accordingly, the VHA sent a staff member to Charlotte to attend a meeting of the selectmen so as to explain to them the operation of Section 23 and to request a selectmen's resolution of approval. For reasons which we cannot ascertain from the record, presumably because currently in dispute,[6] the selectmen, on October 13, 1969, refused to approve the program. As a result of the selectmen's decision plaintiff Lawrence and his family have been unable since 1969 to obtain decent housing in Charlotte.

Plaintiff filed suit on behalf of himself and all others similarly situated,[7] in federal district court for the District of Vermont on January 26, 1971, alleging that the town approval requirement is invalid because it is in conflict with Section 23(a)(2) of the Housing Act, and also because it denies plaintiff his constitutional right to equal protection under the Fifth and Fourteenth Amendments to the United States Constitution. Naming the Commissioners and the Executive Director of the VHA as state defendants, and the Secretary of HUD as the federal defendant, he sought an injunction against the enforcement of the town approval requirement in the statute, and a declaration of invalidity of that portion of the statute. He also alleged that the district court had subject matter jurisdiction under 28

---

agree that in the selection of tenants from the tenant list provided by the Local Authority he shall not "discriminate against any person on the ground of race, color, creed, or national origin"; (c) the lease must contain a general clause that there are no conflicts of interest arising out of the lease; (d) the lease must warrant that the dwelling complies with the local community's building and housing codes, regulations and laws. As for the rent provision, either the Local Authority can agree to pay the owner his full rent and then be partially reimbursed by the tenant to the extent of the tenant's share of the rent, or the Local Authority and tenant can each pay their shares to the owner. RHA 7430.1 Chapter 3, Section 2, § 3a, b, c, and e.

5. 42 U.S.C. § 1421b(a)(2) states:
   The provisions of this section [Section 23 leased housing] shall not apply to any locality unless the governing body of the locality has by resolution approved the application of such provisions to such locality.

6. In his original complaint filed January 26, 1971 and in his amended complaint filed March 30, 1972 plaintiff does allege that the selectmen failed to give their approval on the "ground that public housing would foster the presence of low income families with children in Charlotte." The selectmen deny this in their answer filed May 3, 1972.

7. That is, other low income Vermonters who were eligible to participate as tenants in a Section 23 program but were denied the benefits of Section 23 because of the refusal of the selectmen of the towns in which they resided to approve a Section 23 program.

U.S.C. §§ 1331(a), 1343(3) and 1343(4).[8]

On March 29, 1971 the defendant Secretary moved to dismiss the complaint on jurisdictional grounds. He argued that, as against the federal defendant, jurisdiction did not exist under 28 U.S.C. § 1343(3), for the Secretary, in requiring town approval, was not acting under color of state law, but, rather, was acting pursuant to a federal statute, and that jurisdiction did not exist under 28 U.S.C. § 1343(4) because the United States Housing Act was not an Act of Congress "providing for the protection of civil rights." With reference to the plaintiff's allegation that jurisdiction existed under 28 U.S.C. § 1331(a), the Secretary argued that the jurisdictional amount of $10,000 was lacking.

On June 5, 1972, Judge Holden, in a written Memorandum and Order, determined that jurisdiction existed under 28 U.S.C. § 1331(a), and he denied the defendant Secretary's motion to dismiss.[9]

Thereafter the Secretary filed a motion for summary judgment, and the plaintiff filed a counter motion requesting the empanelling of a three judge court pursuant to 28 U.S.C. § 2282 to entertain his attack upon Section 23(a)(2).[10] By written order dated March 6, 1973, Judge Holden denied the defendant's motion without prejudice and granted the plaintiff's motion for the empanelling of a three judge court. On April 3, 1973 the three judge court convened in Montpelier, Vermont, and entertained oral arguments from all parties to the litigation. The court has also received, and now has before it, a Stipulation Respecting Admissibility of Evidence, dated April 3, 1973, affidavits, a stipulation of facts signed by all legal counsel, and various Exhibits, all specifically agreed to as part of the record in the April 3 stipulation. The court also has before it extensive legal briefs submitted before and after oral argument. At the hearing on April 3, the court granted, on the

---

8. § 1343(3) provides federal jurisdiction over actions to redress the deprivation under color of state law of any federal constitutional right or rights secured by any Act of Congress providing for equal rights of citizens. § 1343(4) provides federal jurisdiction over actions brought for damages or equitable relief for violations of Acts of Congress providing for the protection of civil rights. There is no jurisdictional amount required under either of these two sections. § 1331(a) provides federal jurisdiction over federal questions when the amount in controversy exceeds $10,000. Although these were the principal grounds of jurisdiction alleged at first by the plaintiff, by an amendment to the complaint dated October 4, 1971, he also pleaded jurisdiction over the defendant Secretary under 28 U.S.C. § 1361, the mandamus provision. Moreover, although it does not appear in the record that plaintiff ever moved to have the Administrative Procedure Act included in his complaint as an additional basis of jurisdiction, in his brief before the three judge court he also argues that the APA bestows jurisdiction. 5 U.S.C. § 701.

9. The reason that the Secretary's motion of March 29, 1971 was not disposed of until June 5, 1972 was that Judge Leddy, the judge who originally heard the motion and reserved decision on it, passed away,

and the court was required to hold additional hearings on the motion. In the meantime, on March 30, 1972, the selectmen of Charlotte had been joined as defendants by the grant of a motion to amend the complaint to include them. The plaintiff's claim against the selectmen is based upon an allegation that the selectmen, in refusing to approve the leased housing program in Charlotte, acted arbitrarily and in such a way as to discriminate against plaintiff because he was poor, and because he had a large family. As noted in this opinion, the issues involved in this claim differ from the issues now before the court, and presumably will be decided in a later proceeding.

10. 28 U.S.C. § 2282 reads as follows:
   § 2282. Injunction against enforcement of Federal statute; three-judge court required
   An interlocutory or permanent injunction restraining the enforcement, operation or execution of any Act of Congress for repugnance to the Constitution of the United States shall not be granted by any district court or judge thereof unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title.

ground that the issues involved in the allegations against the Selectmen of Charlotte differed substantially from the issues involved in the determination of the constitutionality of Section 23(a)(2), the selectmen's motion to sever (see n. 9). See Hobson v. Hansen, 256 F.Supp. 18 (D.C.Cir.1966). As to the remaining substantive claims, and the various jurisdictional issues first raised before Judge Holden and now raised for a second time before the three judge court, we reserved decision on the merits.

I

We will first examine the federal defendant's claim that this court lacks subject matter jurisdiction over the claims pleaded against the Secretary of HUD. As noted above, Chief Judge Holden has already ruled, in an Order dated June 5, 1972, that the district court had jurisdiction under 28 U.S.C. § 1331(a). Now the defendant Secretary seeks to reopen this question, essentially alleging that Judge Holden, when he made his previous ruling, erred in holding that the "matter in controversy" exceeded $10,000. Inasmuch as the question raised is substantial, and inasmuch as it goes to the power of this court to adjudicate the claims before it, we will consider it for a second time, despite our reluctance to reopen an issue that has already been decided by Judge Holden. See 1 J. Moore, Federal Practice, 0.60 [4] (2 ed. 1965). Having fully examined the record, we find that the "matter in controversy" in this litigation clearly exceeds $10,000, and we hold that we have subject matter jurisdiction under 28 U.S.C. § 1331.

In a case arising under the general federal question statute, and especially in one involving the legality of an act of a federal officer (see Aguayo v. Richardson, 473 F.2d 1090, 1102 (2 Cir. 1973)), the court should not dismiss the complaint for lack of subject matter jurisdiction unless it concludes, to a legal certainty, that the "matter in controversy" does not meet the jurisdictional prerequisite. St. Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283, 289, 58 S.Ct. 586, 82 L.Ed. 845 (1938); City of Boulder v. Snyder, 396 F.2d 853, 856 (10 Cir. 1968), cert. denied, 393 U.S. 1051, 89 S.Ct. 692, 21 L.Ed.2d 693 (1969); Cortright v. Resor, 325 F.Supp. 797 (E.D.N.Y.1971), cert. denied, 405 U.S. 965, 92 S.Ct. 1172, 31 L.Ed.2d 240 (1972). In his complaint plaintiff has alleged that the "matter in controversy" exceeds $10,000, and we have found no evidence in the record to indicate that plaintiff has made this allegation with less than total good faith, see Firemans Fund Insurance Co. v. Railway Express Agency, 253 F.2d 780 (6 Cir. 1958); McDonald v. Patton, 240 F.2d 424, 425 (4 Cir. 1957), or that, on a reasonable view of the facts, the amount in controversy could not, in fact, exceed $10,000. The defendant argues that jurisdiction does *not* exist because the rent supplement payments plaintiff would receive if he were enrolled in the leased housing program would not exceed $2,000 to $3,000 per year. This argument proves that jurisdiction *does* exist, for, even assuming the plaintiff would receive only $2000 per year if he were enrolled in the program, he has already suffered almost four years of rent supplement deprivation because the selectmen decided in October, 1969 to refuse to approve the operation of Section 23 in Charlotte. Furthermore, this is not the full extent of plaintiff's injury, as he also argues that he will be deprived of future supplements if the defendants continue to enforce the town approval requirement of the statute. Therefore, we must also take account of the value of these future supplements when the total figure that can be said to be the actual amount in controversy is computed.[11] See Aetna

---

11. Of course if the defendant's $3000 figure is used, which, in view of the current rent levels in the state is probably the more realistic figure, the threshold jurisdictional amount is satisfied even without taking account of future supplements.

Casualty & Surety Co. v. Flowers, 330 U.S. 464, 468, 67 S.Ct. 798, 91 L.Ed. 1024 (1947). The defendant cites a district court opinion in Rosado v. Wyman, 304 F.Supp. 1356, 1362 (E.D.N.Y.1969), reversed on other grounds, 414 F.2d 170 (2 Cir. 1969), reversed on other grounds, 397 U.S. 307, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970), for the proposition that the value of these future supplements may not be considered by this court. *Rosado* was a class action in which the plaintiffs contended that a New York State statute, which resulted in a diminution of the dollar value of the welfare benefits plaintiffs would receive, was unconstitutional, and that the state statute violated the federal Social Security Act of 1935, as amended. After finding that the claims of the individual members of the class could not be aggregated for purposes of determining whether the jurisdictional amount had been met, Judge Weinstein concluded that the amount of the reduction brought about by the operation of the challenged statute could not be multiplied by a number of years in the future in order to reach the $10,000 figure because "it is too speculative to assume that any particular plaintiff will remain on welfare for such a period or that the program will remain unchanged." 304 F.Supp. at 1363. This holding is not applicable to the case before us because here, in this litigation, it is not "speculative" to assume that Mr. Lawrence will continue, for the next one or two years, to be eligible to receive rent supplements. Nor, as both Congress and the State of Vermont are deeply committed to the goal of providing decent housing to low and moderate income individuals, and the leased housing program has proved to be one effective method of reaching that goal, is it "speculative" to assume that for the next one or two years the rent supplement program will continue, and the amount of subsidy paid under the program will either increase, to reflect inflation, or remain the same. Having taken into account the approximately $8000 in past supplements that plaintiff has already been deprived of, and the one or two years of future supplements that plaintiff can be reasonably assured of receiving if the town approval requirement is declared to be invalid and its enforcement is enjoined, we conclude that the jurisdictional amount clearly obtains, and that this court has jurisdiction under 28 U.S.C. § 1331.[12]

## II

■ Turning to the merits of this action,[13] the plaintiff argues that the leased housing program's local approval requirement contained in Section 23(a) (2) (42 U.S.C. § 1421b(a)(2)), see n. 5, supra, violates the United States Constitution, and also argues that "town approval" was not the "local approval" Congress intended, and so town approval conflicts with the intent and meaning of the "local" approval requirement. This three judge panel was convened to adjudicate the constitutional claims brought before it, but inasmuch as we might avoid reaching the constitutional issue by deciding the statutory claim we turn to the statutory claim first.[14] See Rosa-

12. In view of this finding we do not decide whether jurisdiction would also exist under one or more of the other grounds noted earlier in this opinion. Moreover, we do not decide whether alleged hardship damages can be included in a case like this one for the purposes of jurisdictional computation. Finally, we do not rule on the question of whether, for jurisdictional purposes, a right to decent housing, per se, if improperly denied, has a value in excess of $10,000. (Cf. Cortright v. Resor, 325 F.Supp. 797 (E.D.N.Y. 1971), cert. denied, 405 U.S. 965, 92 S.Ct. 1172, 31 L.Ed.2d 240 (1972)).

13. Plaintiff has also argued that we should permit this action to proceed as a class action under Rule 23, Fed.R.Civ.P. We decline to do so, for plaintiff has not demonstrated that the prerequisites for a class action as defined in Rule 23 exist. See Dolgow v. Anderson, 43 F.R.D. 472, 491 (E.D.N.Y.1968) ; Eisen v. Carlisle & Jacquelin, 479 F.2d 1005 (2 Cir. 1973).

14. Thus, if local approval does not mean, in Vermont, "town approval," the constitutional issue is mooted.

do v. Wyman, 397 U.S. 397, 402, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). The statutory claim is patently frivolous. Plaintiff argues that the local approval requirement of Section 23(a)(2) requires that the state approve, and that it does not require, or even permit, town approval. However, the clear language of the section, noted in footnote 5, *supra*, demonstrates that such an interpretation is clearly an incorrect one. If Congress had intended to condition the operation of Section 23 in a local community on the approval of a state legislature rather than on the approval of a local governing body, it would surely have said so.

▪ Plaintiff's primary constitutional attack[15] stems from the fact that the town approval requirement, a requirement contained in the federally assisted leased housing program, as well as other federally assisted housing programs, applies *only* to federally assisted *low income* housing programs, and does not apply to federally assisted *moderate income* housing programs. He alleges that as a result of this congressionally imposed unequal classification poor people who qualify for federally assisted low income housing suffer from a disadvantage that is not suffered by moderate income people who also qualify for federally assisted housing.[16] Incontestably, plaintiff is correct in pointing out that the statutes relative to low income housing, that is, leased housing under Section 23, public housing under Section 10, and rent supplement programs for low income persons under Section 101 (12 U.S.C. § 1701s) do contain a requirement that the local governing body approve the application of the statutory provisions, while the statutes relative to moderate income housing such as the federal homeowner mortgage insurance and mortgage subsidy programs (see, e. g., 12 U.S.C. §§ 1709(b), (h), (i), (m); 1713; 1715e, 1715l, 1715m, 1715n, 1715u, 1715y, 1715z), housing loans for the elderly and handicapped (see 12 U.S.C. § 1701q), and housing subsidies for veterans (see 38 U.S.C. §§ 1801, 1810, 1811), do not contain such a requirement.

Nevertheless, it is clear that not all statutory classifications are violative of equal protection, but only those classifications which, when measured under the appropriate test set out by the Supreme Court for the kind of classification being tested, cannot satisfy the requirements of that test. First, then, we must determine the test here appropriate. The plaintiff argues that we should apply the familiar "compelling interest test," under which the state must demonstrate a compelling degree of interest in support of the classification before the statute may be upheld. See Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). Alternatively, he argues that we should adopt a new "means scrutiny test," a test recently enunciated by the Second Circuit in Boraas v. Village of Belle Terre, 476 F. 2d 806 (2 Cir. 1973), under which, before upholding the classification, we must satisfy ourselves that the classification *in fact* (rather than hypothetically) serves some legitimate legislative objective. 476 F.2d at 815, n. 8. See Gunther, "Forward: In Search of Evolving Doctrine On A Changing Court: A Model for a Newer Equal Protection," 86 Harv.L.Rev. 1, 8 (1972).

---

15. Plaintiff also argues that the statute violates his right to due process and that it constitutes an unlawful delegation of legislative power because it does not contain express standards upon which a local governing authority can make a reasonable decision to approve or disapprove the operation within the local community of a Section 23 program. We reject this argument because, as appears from our discussion in the text, infra, we find that the statute does contain standards which permit of reasonable grounds for approval or disapproval of a Section 23 program although these standards are implied rather than expressed.

16. Plaintiff alleges that the local approval requirement as applied in Vermont discriminates against the poor. No evidence was introduced and there is no allegation or suggestion that it is also applied to discriminate against racial or ethnic minorities.

The defendant, on the other hand, urges us to adopt the recognized form of limited scrutiny review under which we uphold the classification unless the plaintiff can prove that the classification, under any conceivable view of the facts, is patently unreasonable. See McGowan v. Maryland, 366 U.S. 420, 426, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961).

■■ At the outset, we reject plaintiff's argument that we should adopt the compelling interest test, a test that has been invoked by the Supreme Court only in cases in which the challenged provision impinged on a "fundamental right," or in which the class involved was a suspect class. See Developments in the Law—Equal Protection, 82 Harv.L.Rev. 1065, 1087–1133 (1969). Though the right to decent housing is at stake in this suit in the sense that the town approval requirement is preventing plaintiff from obtaining decent housing, the Supreme Court has refused to classify housing as a "fundamental right." See Lindsey v. Normet, 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972). Also, we do not believe the challenged provision impinges, *in the constitutional sense,* on plaintiff's right to travel—a right that has been classified as "fundamental" in Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); it clearly does not penalize the exercise of that right. See Dunn v. Blumstein, 405 U.S. 330, 342, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972). The only remaining basis for the invocation of strict scrutiny and the application of the "compelling interest" test is the contention that the class of which plaintiff is a member, i. e., poor persons who are denied participation in federally assisted low income housing programs because of the local approval requirement should be viewed as a "suspect class." However, this argument was explicitly rejected by the Supreme Court in James v. Valtierra, 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971) where the Court, in reviewing the constitutionality of a mandatory referendum provision in the California

constitution requiring that no public housing project could be built in a community until approved by the voters of that community, held that, instead, the rational basis test was the applicable test. 402 U.S. at 141, 91 S.Ct. 1331. See Mahaley v. Cuyahoga Metropolitan Housing Authority, D.C., 355 F.Supp. 1245, 1249 (1973).

■ In view of the Supreme Court's recent decision in San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 1302, 36 L. Ed.2d 16 (1973) we also reject plaintiff's argument that we should here adopt the Second Circuit's new flexible "means scrutiny" test as the applicable test to apply. The *Rodriguez* case involved a constitutional challenge to the Texas system of financing public education with local property taxes. The plaintiffs argued that the effect of the system was to discriminate against the poor, and that it deprived poor children of the level of education benefits that was provided for wealthier children. Though the important right to an equal education was at stake, and arguably, the class being disadvantaged consisted of the poor, the Court, over Justice Marshall's vigorous dissent, refused to depart from the rigid two-tier equal protection analysis. Instead, it applied the limited scrutiny-rational basis test and upheld the challenged classification. Though the Second Circuit in *Boraas* did invoke the more flexible "means scrutiny" approach, *Rodriguez,* a decision issued after *Boraas,* would seem to preempt the *Boraas* formulation. See Boraas v. Village of Belle Terre, *supra.*

■■ Under "minimal scrutiny" review if any state of facts may be conceived which would indicate a rational basis for the local approval requirement of Section 23(a)(2) the congressional enactment must be sustained. Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78, 31 S.Ct. 337, 55 L.Ed. 369 (1911); McGowan v. Maryland, 366 U. S. 420, 426, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). We agree with the defendants that here there is a rational

basis for the local approval requirement, and we therefore sustain it.[17] There are at least two legitimate reasons, each noted in the legislative history of Section 23, which support the local approval requirement. First, Congress may have been concerned with insuring that Section 23 housing would be consistent with other housing and development programs already in effect or planned for the local community. Thus, in the House Report of the Banking and Currency Committee which accompanied the House version (the version which later was enacted into law) to the floor, the Committee stated:

> Your committee believes these provisions involving acquisition or lease of privately owned housing constitute a very valuable supplement to the basic program of new construction. Privately owned housing can be effectively used for low-income families where a combination of certain conditions exist. There must first be a supply of vacant housing on the local market, and that housing must freely be made available, since eminent domain will not be used. Moreover, the housing should be appropriately located to serve the needs of the low-income

families to be housed. Its cost, design, and physical condition must be appropriate. *Also, its use should be consistent with the city plans and renewal programs and in accord with the wishes of the local governing body.* Given these conditions, the use of private housing in a community under the proposed formula would benefit not only the low-income families it serves but also the community as a whole and the private residential market. H.R.Rep.No. 365, 89th Cong. (1965) U.S.Code Cong. & Admin. News, p. 2625. (Emphasis supplied).

Second, Congress may have been concerned with insuring that the possible inflationary effects of the leased housing program would not jeopardize the housing opportunities of other people whose income levels placed them just above public housing eligibility. In its November 1969 Low Rent Housing Leased Housing Handbook (RHA 7430.1, Chapter 1, Section 1, Paragraph 3c) HUD specifically refers to this problem, and suggests a number of techniques by which a state-created housing authority might forestall the possible inflationary effects of leased housing.[18]

17. Plaintiff concedes that there is a "rational basis" for the local approval requirement as that requirement applies to public housing programs under Sections 9 and 10 (42 U.S.C. § 1415(7)) but vehemently denies that there is a rational basis for requiring it to be applied under Section 23 programs. He points to the following differences between Section 10 housing and Section 23 leased housing which he argues make the local approval requirement rational under Section 10, but not under Section 23: (a) the property upon which Section 10 public housing is constructed must be exempt from local property taxes (42 U.S.C. § 1410(h)) (an annual contribution is made in lieu of property taxes), whereas the private buildings leased under Section 23 continue to pay property taxes like any other private property; and (b) the local community may have federally imposed responsibilities under Section 10 (such as providing for the relocation of displaced families (42 U.S.C. § 1415(7)(b)) and demolishing a number of slum units equal to the number of new units which are constructed with federal funds (42 U.S.C. § 1410(a)), whereas the community has no affirmative obligations under Section 23. However, though there would appear to be greater justification for requiring local community approval under Section 10 programs, it does not follow that there is no justification for requiring it under Section 23 programs. We have noted at least two justifications in the text, and, under the rational basis test, this is clearly enough.

18. For example, instead of leasing readily available units, HUD has suggested obtaining units from the following sources: (1) Substandard units made available for leasing through rehabilitation; (2) Units only offered for sale prior to leasing; (3) Units which have been vacant for an extended period; (4) Larger units that may be created by the combination of smaller units; (5) Standard units which are occupied by families of low income who will continue to reside in such units; (6) New housing constructed as a response to the leasing program. RHA 7430.1, Chapter 1, Section 1, § 3c.

In applying the rational basis test, and in upholding the challenged provision, we have suggested grounds upon which a local community may legitimately decide not to approve a Section 23 leased housing program for that community. There may be other grounds that are applicable in addition to the two we have mentioned and discussed. If so, they may be advanced in the appropriate forum by the selectmen in defense of their decision not to permit the program to be initiated in their town. We here hold that the federal statute is safe from constitutional attack, but we caution that this holding does not insulate the Selectmen of Charlotte from the necessity of justifying the withholding of their approval. A local community may not disapprove the operation of Section 23 in that community unless it has legitimate community concerns which necessitate the disapproval. The selectmen's refusal to approve a Section 23 program when requested by the State Authority to implement one results in depriving plaintiff and perhaps other members of the community of an opportunity to exchange condemnable housing for decent housing, and the burden of justifying such a refusal clearly rests on the selectmen who refused the Vermont Housing Authority's overtures. See Mahaley v. Cuyahoga Metropolitan Housing Authority, 355 F.Supp. 1257 (N.D.Ohio 1973); Crow v. Brown, 332 F.Supp. 382 (N.D.Ga.1971), aff'd, 457 F.2d 788 (5 Cir. 1972); Kennedy Park Homes Association v. City of Lackawanna, 318 F. Supp. 669 (W.D.N.Y.1970), aff'd, 436 F.2d 108 (2 Cir. 1970), cert. denied, 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971). We are not concerned here with the reasons behind the refusal of the Charlotte Selectmen to approve the program. Whether the refusal was justifiable is not before us, and we leave for another day the disposition of that issue in the forum applicable to that controversy.

It is ordered that judgment be entered for the defendants other than defendant Selectmen of the Town of Charlotte, Vermont.