Robert **TIMBERLAKE** et al., Plaintiffs,

v.

**Jerry F. KENKEL, Inspector of buildings, Village of Shorewood, et al., Defendants.**

**Civ. A. No. 72–C–664.**

United States District Court, E. D. Wisconsin.

Jan. 8, 1974.

Harry F. Peck and Thomas P. Hayes, Milwaukee, Wis., for plaintiffs.

L. C. Hammond, Jr., and T. Michael Bolger, Milwaukee, Wis., for defendants.

## OPINION AND ORDER

REYNOLDS, Chief Judge.

This is a civil rights action in which the plaintiffs seek to have this court declare unconstitutional several sections of the Municipal Code [1] of the Village of Shorewood (hereinafter referred to as the "Code") which in essence prohibits persons from living together in a relationship that does not conform to the family unit as defined by the Shorewood ordinance.

The plaintiffs are two married couples unrelated by blood. They and their children think of themselves as a "family." Specifically, Paul Beckwith, Leah Beckwith, and their children, Christopher and Angela, together with Robert Timberlake, Barbara Timberlake, and their children, Karen and Jeffrey, have been and are living in a residence zoned "single family" by the Village of Shorewood. Defendants are Jerry F. Kenkel, inspector of buildings for the Village of Shorewood; the municipality of Shorewood; and the individual members of the Village Board of Appeals. The reason for this suit is that the plaintiffs' living arrangement is in violation of several of defendants' zoning ordinances.

At the outset, definitional problems arise over usage of the word "family." Defendants define "family" in § 9–101B.2. of their Code as follows:

"FAMILY shall mean an individual, or 2 or more persons related by blood,

1. Plaintiffs specifically attack the definitions of "family" as contained in § 9–101B:2. and § 9–204B.1. of the Municipal Code. Section 9–101B.2. states:

"FAMILY shall mean an individual, or 2 or more persons related by blood, marriage or legal adoption, or a group of not more than 3 persons who need not be related by blood, marriage or legal adoption, living together in a dwelling unit; included within the definition of a family shall be children placed with a family in a dwelling unit under the provisions of Ch. 48 Wis.Stats., whereby a foster home license is issued, provided that the

number of children shall not exceed 4, unless all are in the relationship to each other of brother or sister."

Section 9–204B.1. states:

" * * * family, within the meaning of this subsection, shall include an individual or 2 or more persons related by blood, marriage or legal adoption, including children placed with a family in a dwelling unit under the provisions of Ch. 48 Wis.Stats. whereby a foster home license is issued and the number of children placed thereunder does not exceed 4 unless all are related to each other as brother or sister."

marriage or legal adoption, or a group of not more than 3 persons who need not be related by blood, marriage or legal adoption, living together in a dwelling unit; included within the definition of a family shall be children placed with a family in a dwelling unit under the provisions of Ch. 48 Wis.Stats., whereby a foster home license is issued, provided that the number of children shall not exceed 4, unless all are in the relationship to each other of brother or sister."

The plaintiffs call themselves a "family." They, however, define "family" in a different manner than the defendants. Their definition essentially corresponds with one provided in Black's Law Dictionary at 727 (1951): "In broad or primary sense 'family' means: a collective body of any two persons living together in one house as their common home for the time; * * *" and another found in Webster's Third New International Dictionary (unabridged) at 821 (1966) which defines "family" as " * * * a group of individuals living under one roof: HOUSEHOLD * * *." For the purposes of this lawsuit, plaintiffs and defendants agree that their respective definitions of "family" are not the same and, indeed, are the root cause of the present action. In this opinion, I have attempted to carefully identify whose concept of "family" I am referring to at the particular point in time the word arises.

Jurisdiction is claimed under 28 U.S.C. § 1331, § 1343(3), and 42 U.S.C. § 1983. This matter is before the court on both defendants' motion to dismiss on jurisdictional grounds and for failure to state a claim upon which relief can be granted and on plaintiffs' motion for summary judgment. Oral argument was heard on all pending motions. I grant the defendants' motion to dismiss the action against the defendant Village of Shorewood, deny the defendants' motion to dismiss as to all other parties, and grant the plaintiffs' motion for summary judgment. I hold that since the zoning ordinance attacked here (i. e., de-fendants' definition of "family") is not supported by any rational basis consistent with traditional zoning objectives, it therefore violates the equal protection clause of the Fourteenth Amendment.

The present action arose in the following manner. The plaintiffs Paul Beckwith and Leah Beckwith hold legal title to the property as joint tenants. The residence in question is located at 4065 North Richland Court in Shorewood, and consists of a two-story house and lot. The residence is situated within a use district zoned as "Single Family Residence" pursuant to the Village Code. On October 7, 1972, the Beckwiths were joined by the Timberlakes, and they all commenced living together as one family. On October 18, 1972, building inspector Kenkel visited their residence and orally informed them that their living arrangement was in violation of the Code. On November 1, 1972, Kenkel further informed them of that fact by letter and requested that "this violation must be corrected without delay." In addition, the letter asked that plaintiffs contact him if they had any questions concerning the matter. On November 15, 1972, the plaintiffs' attorney wrote a letter to the building inspector requesting additional information about the alleged violation and specifically asking whether the letter of November 1, 1972, was an appealable determination of the Code. Shorewood took this matter under advisement, and plaintiffs initiated the instant lawsuit on December 6, 1972, before defendants responded to their request.

The following facts are set forth in the verified complaint, answer, and affidavits filed by both parties. There are no material facts in dispute. Paul Beckwith holds title to the premises in question, and these premises consist of a two-story house and lot. The house is the type ordinarily regarded as a single family dwelling. The house consists of a living room, dining room, kitchen, family room, sunroom, study, four bedrooms, and three baths, all making up approximately 2,300 square feet of liv-

460

ing space. The premises have been occupied by all the plaintiffs since October 7, 1972, when they formed the present living arrangement. This living arrangement is based on the fact that plaintiffs have voluntarily assumed all of the major tasks involved in the care and upkeep of the premises in question; that the plaintiffs contribute an equal amount to the expenses connected with their living arrangement including monthly payments on the mortgage, utility bills, expenses for repair, and maintenance of the premises, and food, furnishings, and household items used by all; and that the plaintiffs also prepare and eat meals together and share the rooms such as the library, study, workroom, and laundry. In their first affidavit, plaintiffs explain the reasons why they live as a one-family unit. Robert Timberlake is an ordained minister of the United Presbyterian Church; Leah Beckwith and Paul Beckwith are both members of the church, Paul currently serving as a ruling elder and Leah serving as a teacher; and Barbara Timberlake has been active in church work. Each of them adheres to three basic tenets of "orthodox" Christianity; i. e., first, love thy neighbor; second, create stable marriages; and three, liberate the sexes from traditional stereotypes and sex roles. Due to these beliefs, and prior to living together, plaintiffs desired to share the duties of child rearing equally between husband and wife, but one husband's work day prevented this. Plaintiffs wanted to make available to their children the emotional support of the extended family with several adult figures present, but this was impossible because their nearest blood relatives were hundreds of miles away. Therefore, it seemed true to their beliefs and desires that they establish one family.

In their second affidavit, plaintiffs add that Robert Timberlake and Barbara Timberlake paid $5,000 of the down

payment of $10,000 and contribute one-half of the monthly mortgage payments; that all expenditures for food, repairs, capital improvements, and utilities are divided equally between the parties; and that the plaintiffs believe the sharing of work, economic burdens, and living space is an integral part of their living experience.

In his affidavit, defendant Kenkel states that in 1970 the population of the Village of Shorewood was 15,576 residents; that there were 6,017 housing units, 2,375 of which were single family and 3,681 of which were multi-family structures; that the Village provides more than an adequate opportunity to purchase multi-family structures without violating the Code; and that the Beckwiths purchased a residence in an area zoned single-family without notifying the Village that they and the Timberlakes were going to live together as one family.

The affidavit of the seven duly-elected trustees [2] of the Village of Shorewood state that they can enact, amend, and review zoning laws; that they reviewed the definition of "family" as contained in their Code; and that they believe that their definition of "family" [3] is substantially related to the public health, safety, morals, and general welfare of the Village in twelve respects which basically fall within the following four categories: it preserves the residential character of the community; it preserves residential property values; it controls population density and therefore insures the availability of better services to Village residents; and it protects the cherished ideals of the family and preserves the high moral character of the Village.

Mr. Ralph von Briesen states in his affidavit that he was the former owner of the property in question at 4065 North Richland Court; that he sold it to

---

2. Chester Krizek, Allan J. Klotsche, George W. Bolln, David Keyser, Grace Abramson, James H. Larson, and Edward L. Heidenreich.

3. See § 9–101B.2., supra n. 1.

the Beckwiths; that at no time was he aware that the Beckwiths were planning to occupy the residence with the Timberlakes; and that the Beckwiths led him to believe that only they and their children were going to occupy the premises.

## I. *Procedural Questions*

In their complaint, plaintiffs specifically allege that their rights under the Fourteenth Amendment have been abridged by an arbitrary classification which interferes with several of their rights, among these being the First Amendment rights to free exercise of religion and freedom of association; and further, the right to privacy, whether founded in the Fourteenth Amendment, the Ninth Amendment, or the penumbrae of various amendments. Additionally, plaintiffs allege that they have been deprived of their constitutional right to travel and settle where they please. I find that the complaint properly alleges that the defendants have infringed a federally guaranteed right, privilege, or immunity secured to the plaintiffs by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens. Thus, the requirements of 28 U.S.C. § 1343(3) and 42 U.S.C. § 1983 are satisfied.

Defendants briefly argue for abstention by this court. Such a course of action has traditionally been justified only where there has been an ambiguity in the application and interpretation to be given a state or local law. Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967). Such is not the case here. The state or local statute is not ambiguous. All the parties agree

that the conduct the plaintiffs wish to pursue is clearly contrary to the written municipal ordinance.

Defendants further assert that the present action should be dismissed because plaintiffs have not exhausted their administrative remedies. They allege that since zoning is peculiarly a local problem, and since the State of Wisconsin has provided a procedural mechanism (§ 62.23(7)(e))[4] for seeking zoning changes, plaintiffs should be required to pursue their remedies at a lower level than the federal district court. The United States Supreme Court held in Monroe v. Pape, 365 U.S. 167, 183, 81 S.Ct. 473, 482, 5 L.Ed.2d 492 (1961), that the goals of the Civil Rights Act may not be defeated because relief was not first sought under a state law which provided a remedy. The Court stated:

> " * ' * * It is no answer that the State has a law which if enforced would give relief. The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked. * * *"

In the instant case, it further appears that plaintiffs' claim that their civil rights have been deprived (under 28 U.S.C. § 1343(3) and 42 U.S.C. § 1983), is based entirely on federal law, there being no underlying issues of state law. Therefore, McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963), controls and plaintiffs do not have to exhaust their administrative remedies.

Defendants have also moved for dismissal of the action as against the de-

---

4. Section 62.23(7)(e)7, Wis.Stats. (1971), states in part:

"The board of appeals shall have the following powers: To hear and decide appeals where it is alleged there is error in any order, requirement, decision or determination made by an administrative official in the enforcement of this section or of any ordinance adopted pursuant thereto; to hear and decide special exception to the terms of the ordinance upon which such board is re-

quired to pass under such ordinance; to authorize upon appeal in specific cases such variance from the terms of the ordinance as will not be contrary to the public interest, where, owing to special conditions, a literal enforcement of the provisions of the ordinance will result in practical difficulty or unnecessary hardship, so that the spirit of the ordinance shall be observed, public safety and welfare secured, and substantial justice done. * * *"

fendant Village of Shorewood on the ground that 28 U.S.C. § 1343(3) and 42 U.S.C. § 1983 do not apply to municipalities. The Village of Shorewood is a municipal corporation formed pursuant to the laws of the State of Wisconsin. The United States Supreme Court additionally found in Monroe v. Pape, 365 U.S. 167, 187–192, 81 S.Ct. 473, 5 L.Ed. 2d 492 (1961), that a municipality is not within the purview of § 1983. The Seventh Circuit carved out an exception to this, finding that actions for equitable relief were maintainable against municipal corporations under § 1983. Schnell v. City of Chicago, 407 F.2d 1084 (7 Cir. 1968); Adams v. City of Park Ridge, 293 F.2d 585 (7 Cir. 1961). Recently, however, the Supreme Court corrected this approach by stating that § 1983 did not have a bifurcated application to municipal corporations depending on whether equitable or monetary relief was sought. City of Kenosha v. Bruno, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973). Therefore, as against the defendant Village of Shorewood, plaintiff's action for equitable relief should be dismissed. Concerning this dismissal, there is nothing in the record to allow me to conclude that there is more than $10,000 in controversy, and thus to find an alternative ground of jurisdiction, that of 28 U.S.C. § 1331, on which to base jurisdiction over the defendant municipality. See City of Kenosha v. Bruno, supra, at 516, 93 S.Ct. 2222 (Mr. Justice Brennan, concurring).

## II. *Substantive Questions*

The standard with which I begin is that presented in Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S. Ct. 114, 71 L.Ed. 303 (1926). In *Euclid* the owner of a parcel of unimproved land contested the constitutionality of several zoning ordinances which set minimum lot sizes, maximum building heights, and prohibited, for example, the use of land for apartments. The United States Supreme Court, in upholding the ordinances, stated:

" * * * while the meaning of constitutional guaranties never varies, the scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation. In a changing world it is impossible that it should be otherwise. But although a degree of elasticity is thus imparted, not to the *meaning*, but to the *application* of constitutional principles, statutes and ordinances, which, after giving due weight to the new conditions, are found clearly not to conform to the Constitution, of course, must fall." 272 U.S. at 387, 47 S.Ct. at 118.

The Court continued:

" * * * the reasons are sufficiently cogent to preclude us from saying, as it must be said before the ordinance can be declared unconstitutional, that such provisions are clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare. [Citations omitted.]" 272 U.S. at 395, 47 S.Ct. at 121.

Shortly after the decision in *Euclid*, the Supreme Court showed itself willing to rule against zoning ordinances. In Nectow v. City of Cambridge, 277 U.S. 183, 188, 48 S.Ct. 447, 448, 72 L.Ed. 842 (1928), the Court specified a standard to be examined in finding a zoning ordinance unconstitutional:

" * * * The governmental power to interfere by zoning regulations with the general rights of the land owner by restricting the character of his use, is not unlimited * * * such restriction cannot be imposed if it does not bear a substantial relation to the public health, safety, morals, or general welfare. * * * "

Thus, from the very beginning it was realized that although almost every zoning ordinance represented a restriction upon a citizen's right to use his land, and although these zoning ordinances may in general be a proper exercise of

governmental power, it was equally possible that they may constitute an illegitimate restriction of a citizen's rights unless supported by a substantial public purpose. In the early cases the constitutionality of the local zoning laws was attacked under the due process clause. Today, however, as was stated in Boraas v. Village of Belle Terre, 476 F.2d 806, 813 (2d Cir. 1973): "To the requirement that zoning laws satisfy due process, as thus enunciated by *Euclid* and its brethren, there must be added the important condition that they not discriminate in violation of the Equal Protection Clause." The possibility that the standards of substantive due process will be utilized by the federal courts to analyze zoning ordinances is remote. See Note, "The Equal Protection Clause and Exclusionary Zoning After *Valtierra* and *Dandridge*," 81 Yale L.J. 61, 66 (1971).

██ Debate over the constitutionality of the Shorewood zoning ordinance has therefore revolved around the question of whether or not the requirements of the equal protection clause are satisfied. Firstly, the parties are in agreement that the ordinance does not raise an issue as to a "suspect" classification. See Reitman v. Mulkey, 387 U.S. 369, 87 S. Ct. 1627, 18 L.Ed.2d 830 (1967); Graham v. Richardson, 403 U.S. 365, 91 S. Ct. 1848, 29 L.Ed.2d 534 (1971); and Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956). Secondly, I do not feel that I should, for reasons hereinafter stated, decide whether there has been an abridgement of "fundamental" rights. Consequently, the present case does not fit into any of the categories requiring application of the compelling state interest test.

Plaintiffs argue to the contrary—that their fundamental rights have been abridged. They place much weight on the theory that if not allowed to live as one family, their right to religious freedom will be abridged. Plaintiffs specifically describe their religious beliefs and the manner in which these beliefs motivate their lives. They cite the case of Wisconsin v. Yoder, 406 U.S. 205, 215, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972), for the proposition that " * * * only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion."

Plaintiffs additionally argue that if they are not allowed to live as one family, they will be denied their constitutional right of association. They add to this the feeling that in dealing with freedom of association involving a set of relationships as intimate as those between the plaintiffs, it is inevitable that the right become intermingled with the right to privacy as articulated in Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). See also Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L. Ed.2d 147 (1973). Based on these cases, the plaintiffs present the following argument: that if it were possible to design the "zone of privacy" discussed in *Griswold*, the home would lie at the very center, and within the home the assocation of the individuals who lived there would in turn occupy a central position. Defendants contend, however, that these are not the objectives of the Shorewood zoning ordinance. They argue that, in fact, the opposite is true, for Shorewood has established twelve different zoning districts [5] in an effort to provide opportunities within the Village for all options. Defendants further allege that

5. Section 8–302 of the Municipal Code divides Shorewood into twelve districts known as:
 1. Lake Drive Residence District
 2. Single Family Residence District
 3. One and Two-Family Residence District
 4. Estabrook Homes District—Residential
 5. Estabrook Homes District—Business
 6. Apartment House District
 7. Multi-Family District No. 1
 8. School, Church and Public Building District
 9. Hospital Zone District
 10. First Business District
 11. Third Business District
 12. Planned Development District

not only did zoning allow complete development to suit the living patterns sought by individuals like the plaintiffs but that there are numerous structures so developed.

According to the present methodology of the United States Supreme Court in these matters, I need not resolve these questions; that is, whether or not the zoning ordinances in question serve to infringe the plaintiffs' fundamental rights to religious freedom, freedom of association, or privacy. While the rights alleged by plaintiffs are "fundamental" in the context of the specific cases in which they are defined, I am not going to decide that an extension of those cases to the present fact situation is justified. Hence, I do not decide the issue of fundamental rights.

 Certainly the rights claimed by the plaintiffs are important. Although it is clear that it is not within the province of the court to create substantive constitutional rights in the name of guaranteeing equal protection of the laws, it is also evident that the equal protection clause has lost none of its bite.[6] See Chicago Police Dep't v. Mosley, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed. 2d 212 (1972); James v. Strange, 407 U.S. 128, 92 S.Ct. 2027, 32 L.Ed.2d 600 (1972); Weber v. Aetna Cas. & Sur. Co., 406 U.S. 164, 92 S.Ct. 1400, 31 L. Ed.2d 768 (1972); Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); Dunn v. Blumstein, 405 U.S.

330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); Bullock v. Carter, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972); Mayer v. City of Chicago, 404 U.S. 189, 92 S.Ct. 410, 30 L.Ed.2d 372 (1971); Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971); Jackson v. Indiana, 406 U.S. 715, 92 S.Ct. 1845, 32 L. Ed.2d 435 (1972) (decided on alternative grounds);[7] Sugarman v. Dougall, 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (decided June 25, 1973); and In re Griffiths, 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (decided June 25, 1973). These cases make it clear that in most instances the Supreme Court has replaced the rigid "two-tiered" formula with a more flexible approach.

 In the absence of a suspect classification and/or a fundamental interest, the question is whether the legislative distinction is arbitrary and without rational relationship to a legitimate legislative objective. As the Supreme Court recently stated in Reed v. Reed, 404 U.S. 71, 75–76, 92 S.Ct. 251, 253, 30 L.Ed.2d 225 (1971):

"\* \* \* this Court has consistently recognized that the Fourteenth Amendment does not deny to States the power to treat different classes of persons in different ways. [Citations omitted.] The Equal Protection Clause of that amendment does, however, deny to States the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the object

6. See generally Gunther, "The Supreme Court 1971 Term, Forward: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection," 86 Harv.L.Rev. 1 (1972). Gunther illuminates the path taken by the Supreme Court during the 1971 term in the area of equal protection by stating at page 20:

"The mood is far different in last term's interventionist invocations of old equal protection formulas. In terms of the longstanding connotations of the old equal protection, the decisions are novel if not bizarre. Judicial deference to a broad range of conceivable legislative purposes and to imaginable facts that might justify classifica-

tions is strikingly diminished. Judicial tolerance of overinclusive and underinclusive classifications is notably reduced. Legislative leeway for unexplained pragmatic experimentations is substantially narrowed."

7. Gunther, supra, pages 11–12, states that of the fifteen cases in his study, the constitutional challenge was rejected in only four: Jefferson v. Hackney, 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972); Lindsey v. Normet, 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed. 2d 36 (1972); Schilb v. Kuebel, 404 U.S. 357, 92 S.Ct. 479, 30 L.Ed.2d 502 (1971); Richardson v. Belcher, 404 U.S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971).

of that statute. A classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.' Royster Guano Co. v. Virginia, 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989 (1920). The question presented by this case, then, is whether a difference in the sex of competing applicants for letters of administration bears a rational relationship to a state objective that is sought to be advanced by the operation of [the particular statutes involved]."

Thus, I am to consider the nature of the unequal classification attacked, the nature of the adversely affected rights, and the governmental interest urged in support of the classification. This appears to be a more realistic methodology than that formerly used under the two-tiered formula, since sometimes in cases where no suspect classifications or fundamental rights were at issue, blatant inequalities went unchecked. This approach is particularly appropriate in the instant case where individual human rights of opposing groups are involved rather than issues concerning business regulations. Boraas v. Village of Belle Terre, 476 F.2d 806, 815 (2d Cir. 1973). See United States v. Carolene Products Co., 304 U.S. 144, 152–153 n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938); Tussman and tenBroek, "The Equal Protection of the Laws," 37 Calif.L.Rev. 341, 373 (1949). Furthermore, this approach is especially appropriate because the instant case involves delicate and difficult questions of local planning, a consideration counseling a more restrained form of review. San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).

The nature of the plaintiffs' adversely affected rights having already been examined, I must inquire whether the defendants have shown that the classifications in question here are rationally related to a legitimate governmental inter-

est. Identifying the municipality's purposes in the passing of an ordinance is not an easy task. Here, the declared policy of the Shorewood zoning ordinances is ordained by the Village Board as follows: "It is hereby determined that public health, welfare, morals and convenience shall be protected, promoted and conserved by the regulations contined in this ordinance." See § 8–301, Code. Defendants have submitted the affidavit of the seven trustees of the Village Board. In this affidavit the trustees essentially assert that the challenged ordinance should be upheld as rationally related to the clearly legitimate governmental interests of (1) preserving the residential character of the municipality, (2) preserving its residential property values, (3) establishing population density control, and (4) preserving the high moral standards of the community. In their brief, defendants repeat this line of thought with the exception that they do not seriously argue that single-family housing as defined by the ordinance preserves the high moral character of the community. It therefore appears that defendants do not present this as one of the legitimate governmental interests to be weighed in considering the constitutionality of the statutes.

What is contended here is, in essence, that by adopting a "single-family" zoning ordinance for certain areas within the Village (1) single families are more likely than families with more than three unrelated members to preserve the residential character of the municipality; (2) single families are more likely than voluntary families to preserve residential property values; and (3) single families are more likely than voluntary families to be smaller in size and, therefore, more in accordance with population density control standards.

I am guided by the recent Supreme Court decision in United States Dept. of Agriculture v. Moreno, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (decided June 25, 1973). In Moreno the Court found § 3(e) of the Food Stamp Act to be un-

constitutional as it differentiated between two classes of individuals, one class being composed of those individuals who live in households, all of whose members are *related* to each other, and the other class consisting of those individuals who live in households containing one or more individuals who are *unrelated* to the rest. The Court found this distinction between *related* and *unrelated* persons to be wholly without any rational basis and therefore invalid under the due process clause of the Fifth Amendment. The situation in *Moreno* is not unlike that found in the instant case.

In *Moreno*, the Supreme Court specified that an examining court should analyze other sections of the statute in question in considering whether these sections accomplish the same results as those envisioned for the particular section in question.

The Code of Shorewood provides other means than the "single-family" zoning provision to deal with the problems of preservation of the residential character, preservation of the residential property values, and establishment of population density control. For example, § 8–304 of the Code states in subsection E that it shall be unlawful to maintain or erect any coop or pen for poultry, rabbits, cows, etc.; that rooming houses are prohibited in the Village; and that the construction of filling stations shall be restricted. And § 8–306 provides in subsection A that no trade, business, or profession shall be carried out from a "Single Family" residence; that it is unlawful to erect or maintain any building for church, school, museum, hotel, hospital or sanitarium purposes, or apartments designed for residence usage; and further provides in subsection B that the size of residential lots is regulated as not being allowed with street fronts of not less than 50 feet and with areas of not less than 6,000 square feet; that no "single family" residence building can occupy more than 30 per cent of the area of an interior lot nor more than 40 per cent of a corner lot.

Subsection C provides set regulations and subsection D provides maximum height regulations for single family residences. The existence of these provisions shows that there are other ways to preserve both residential character and property values, and also establish population density control. These latter provisions are as responsive to those alleged goals as the provision that more than three unrelated individuals cannot live together in an area zoned "single-family."

Defendants' allegations that the zoning ordinances are rationally related to the clearly legitimate governmental interests of (1) preserving the residential character of the municipality, (2) preserving residential property values, and (3) establishing population density control, must be individually examined. I find that the means utilized by the Village of Shorewood, that of "single-family" zoning, not to be rationally related to any of the three government interests listed above. I also find that less onerous means exist to reach these same ends. For the purposes of this examination, I assume, without deciding, that the reasons given for defendants' zoning ordinance are valid legislative goals.

■ ■ Defendants argue first that "single-family" zoning ordinances preserve the residential character of the community. They state that prior to zoning, haphazard conditions existed in municipalities respecting the location of buildings and uses for dwellings, trades, and industries, commercial and otherwise. After the advent of zoning, municipalities then became able to regulate building development and the use of property by classifying three broad categories of uses: districts devoted entirely to single-family residences on a prescribed minimum lot, districts in which multi-family structures are permitted, and business districts subclassified into several districts with different uses in each. In this traditional zoning argument, defendants argue that single-family zoning controls congestion in the streets and the use of open spaces with-

in the community. This is not a persuasive argument. One characteristic of suburban growth in the United States has always been the ability of the suburbs to absorb rapid population growth. Note, "Exclusionary Zoning and Equal Protection," 84 Harv.L.Rev. 1645, 1667 (1971). Defendants' viewpoint that voluntary families would not preserve the residential character of the community is pure speculation. Such a conclusion is entirely unsupported by the evidence, and I am unable to judicially notice it.

While the aesthetics of the community is a desirable value, the means approach requires that I inquire as to whether "single-family" zoning implements this at too high a cost or whether the same end could be reached by less onerous means. As I mentioned previously, the Shorewood ordinances already include several provisions insuring a maintenance of the high aesthetic quality of the community. I find such provisions as set-back requirements, size of lot, and height regulations to be more rationally related to aesthetic considerations than the "single-family" requirement.

Defendants further argue that the "single-family" zoning ordinance preserves property values. Defendants' argument cuts both ways. They indicate that the single-family ordinance provides for a stable community of citizens and prevents inflated property prices and inflated rentals. At another point, however, they imply that the end of single-family housing will make the community less aesthetic, will result in more traffic and more children, will reduce the quality of police, fire, transportation, and educational services and, consequently, will drive property values down. The contradictory approach that defendants take here persuades me that their arguments are nothing but mere conjecture. Here again, defendants have not introduced one iota of evidence into the record in support of their theory. Several commentators have noted that changes in the social composition of a municipality do not necessarily affect property values. L. Laurenti, Property

Values and Race 47 (1960); Note, 84 Harv.L.Rev. at 1666. To theorize otherwise, without a proper record, is beyond the power of this court.

Defendants finally argue that "single-family" housing is a means of controlling population density. Defendants assume that their definition of "family" is self-limited and that the plaintiffs' "family" can be any size whatsoever. This argument is again mere speculation. No statistical , information has been presented to the court in support of this proposition. If control of population density were the real goal of the ordinance, the definition of "family" found in § 9–101B.2. would not provide for the respective inclusion of those individuals related by marriage to members of the family and, therefore, would not allow a situation to exist whereby numerous brothers and sisters could live together with their respective spouses, along with foster children, and still be considered a "single-family" under the ordinance. See City of Des Plaines v. Trottner, 34 Ill.2d 432, 216 N.E.2d 116, 119 (1966). Furthermore, if the ordinance was designed to limit population density at the same level as that existing in nuclear family units, it would not limit the number of unrelated individuals to three per single-family housing unit. This figure is without a doubt lower than the size of the average nuclear family. As was stated in Boraas v. Village of Belle Terre, 476 F.2d 806, at 817 (2d Cir. 1973):

> " * * * Assuming such a purpose, a more permissive ordinance would suffice. Furthermore, such an objective could be achieved more rationally and without discrimination against unrelated groups by regulation of the number of bedrooms in a dwelling structure, by restriction of the ratio of persons to bedrooms, or simply by limitation of occupancy to a single housekeeping unit. * * * "

In conclusion, there is no rational basis for the ordinances in question, and there are less onerous means to achieve the desired ends. Some of these already

468

are in the Municipal Code and some more could be adopted.

 The defendants argue that other housing is available to the plaintiffs within the municipality of Shorewood. This argument is not persuasive because it assumes that the original classification was a rational one, and for the reasons stated above, I have found that it was irrational, and an irrational classification is not saved because one can escape its irrationality by living elsewhere. In Boraas v. Village of Belle Terre, supra, the municipality was totally zoned single-family.[8] The Second Circuit did not agree with the municipality's argument that any constitutional infirmity was swept away by the fact that single-family housing was available in other surrounding communities which were not similarly zoned. The Court stated at 817 of 476 F.2d:

> " * * * The fact that an unconstitutional ordinance is limited in geographical scope does not make it any less an abridgement of guaranteed constitutional rights. See Buchanan v. Warley, 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149 (1917); Murdock v. Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943). Appellants are entitled, subject to lawful and reasonable local laws, to travel and settle down where they please. See King v. New Rochelle Municipal Housing Authority, 442 F.2d 646, 648 (2d Cir. 1971); Cole v. Housing Authority, 435 F.2d 807 (1st Cir. 1970), affirming 312 F.Supp. 692 (D.R.I.1970). * * * "

 In conclusion, the attacked provisions of the Code [9] have not been shown to be supported by any rational basis which is consistent with permissible zoning objectives. They must, therefore, be held to be unconstitutional as in violation of the equal protection clause of the Fourteenth Amendment.

8. The two districts exclusively zoned single-family are (1) the "Lake Drive Residence District," and (2) the "Single Family Residence District." These two districts essentially run north and south, following the Lake Michigan shoreline, and correspond with the most attractive area in the Village of Shorewood.

9. See footnote "1" above.